UNITED STATES of America,
Plaintiff,

v.

Levangela BEDONIE, Defendant.

United States of America, Plaintiff,

v.

Redd Rock Serawop, Defendant.

Nos. 2:02–CR–00690–PGC,
2:03–CR–00339 PGC.

United States District Court,
D. Utah,
Central Division.

May 11, 2004.

Kristen Angelos, Federal Defender, Fred Metos, Salt Lake City, UT, for Defendants.

## MEMORANDUM OPINION AND ORDER AWARDING LOST INCOME AND OTHER RESTITUTION

Kevin Sundwall, U.S. Attorney, Felice J. Viti, U.S. Attorney, Salt Lake City, UT, for Plaintiffs.

CASSELL, District Judge.

### TABLE OF CONTENTS

FACTUAL AND PROCEDURAL BACKGROUND ...............................1288
 A. United States v. Bedonie .........................................1288
 B. United States v. Serawop ........................................1291

ANALYSIS.........................................................1293
 I. The Court Must Order Restitution for the Violent Crimes Committed by
 Defendants Bedonie and Serawop ......................................1293
 A. The Mandatory Victim Restitution Act Applies to Bedonie's and
 Serawop's Crimes of Violence......................................1293
 B. Even if the Mandatory Victims Restitution Act Does Not Apply to Ms.
 Bedonie, the Court Would Impose the Same Restitution Under the
 Victim Witness Protection Act .....................................1294
 1. The Need to Provide Restitution to Victims Is More Pressing than
 the Risk of Extending Court Proceedings...........................1294
 2. The Seventh Circuit's Contrary Analysis in United States v. Fountain
 is. Not Persuasive ................................................1296
 3. The Court Would Order Full Restitution Under the VWPA .............1298

 II. Bedonie and Serawop Must Pay Restitution for the Lost Income of their
 Victims ...........................................................1299
 A. The Deceased—Mr. Johnson and Beyonce Serawop–Are Entitled to
 Restitution as "Victims" of the Homicide Offenses Against Them ..........1299
 1. Lost Income Is Properly Awardable to Mr. Johnson as the "Victim"
 of a Homicide ....................................................1299
 2. The Court Need Not Reach the Issue of Whether Ms. Johnson is Also
 a Victim of the Offense ...........................................1300
 3. Lost Income Is Properly Awardable to Beyonce Serawop as the
 "Victim" of a Homicide ...........................................1302
 B. The MVRA Requires a Lost Income Award in Homicide Cases.............1302
 C. The MVRA Requires an Award for Both Past and Future Lost Income....1305
 D. The MVRA Should be Interpreted Broadly as a Remedial Measure
 Rather than Narrowly Under the Rule Lenity .........................1309

III. Defendant Bedonie Should Pay Lost Income Restitution of $446,665 and
 Defendant Serawop Should Pay Lost Income Restitution of $325,751 ...........1311
 A. Expert Testimony on the Amount of Lost Income .......................1312
 1. Dr. Randle's Expect Testimony is Admissible .........................1312
 2. Lost Income Projections for Mr. Johnson .............................1313
 3. Lost Income Projections for Beyonce Serawop .........................1314
 B. Race and Sex Adjustments .........................................1315
 C. Calculating the Lost Income Awards .................................1320
 1. The Lost Income of Mr. Johnson ....................................1320
 2. The Lost Income of Beyonce Serawop................................1322

 D. No Need to Offset for Consumption .....................................1322

 IV. Restitution is also Proper for the Services of a Navajo Medicine Man ............1327

 V. The Defendants' Restitution is Due Immediately, Payable on a Schedule .........1329

CONCLUSION ......................................................................1333

The court has before it two tragic homicide cases presenting significant restitution issues. The court concludes that substantial restitution should be ordered in both cases, including restitution for the future income that the victims lost when they were killed by the defendants. In particular, the court orders defendant Bedonie to pay restitution for lost income of her victim—Mr. Brian Johnson—of $446,665 The court also orders defendant Serawop to pay restitution for lost income of his victim—Beyonce Serawop—of $325,751.

A brief outline of how the court reaches that conclusion may be useful at the outset. Part I of this opinion explains that the Mandatory Victims Restitution Act (MVRA), which applies to crimes of violence, is applicable to the crimes of involuntary and voluntary manslaughter committed by defendants Bedonie and Serawop respectively. Part II concludes that the MVRA requires a restitution award in homicide cases for lost income of the victims, including income that they would have lost in the future. Part III reviews issues relating to the calculation of the award. The court appointed an expert to calculate lost income in this case, who made reasonable and reliable projections of future lost income. The most appropriate of those projections rely not on the race or sex of the victims, but rather on race- and sex-neutral data. Using these neutral projection, without any discount for possible "consumption" of income by the victims, is the appropriate way to calculate restitution. Each victim lost several hundred thousands of dollars in income, which the defendants should be required to repay. Part IV

concludes that defendant Bedonie should also be ordered to pay restitution for the services of Navajo medicine man used by Mr. Johnson's family as part of the funeral services in this case. Part V determines that the restitution of the defendants is due immediately and to be paid on an appropriate schedule.

## FACTUAL AND PROCEDURAL BACKGROUND

The factual and procedural background of the Bedonie and Serawop cases is as follows.

### A. *United States v. Bedonie.*

On the evening of April 19, 2002, defendant Levangela Bedonie and her boyfriend, Oscar Williams, stopped at the Ismay Trading Post and agreed to give a ride to the victim in this case—Brian Johnson—and two other men. As Ms. Bedonie drove toward Montezuma Creek on the Navajo Reservation, she drank beer offered to her by her boyfriend and frequently turned to face Johnson and the others in the back seat. Each of the three men repeatedly asked her to watch where she was driving. She told them she knew what she was doing.

Not too much farther down the road, Ms. Bedonie abruptly turned the steering wheel, causing the car to fishtail. Clearly under the influence of alcohol, she lost control, causing the car to skid off the road and roll about four times before coming to rest on its tires. Mr. Johnson was still in the vehicle, while the two other rear seat passengers got out and summoned help. A short time later, emergency medical technicians arrived at the scene of the

accident, which was approximately 11 miles north of Aneth, Utah, on the Navajo Reservation. The technicians were unable to revive Mr. Johnson, whose skin was already cold to the touch when they arrived. An examination by the Utah State Department of Health Medical Examiner determined that Mr. Johnson died as a result of a blunt force injury to the head.

A bitter irony of this tragedy is that just prior to picking up Mr. Johnson and his friends, Ms. Bedonie had picked up Mr. Williams at the conclusion of a 90–day jail sentence for driving under the influence of alcohol.

On November 6, 2002, Ms. Bedonie, an enrolled member of the Navajo Indian Tribe, was charged in a one-count indictment with involuntary manslaughter within the Navajo Nation.[1] She was arraigned on July 29, 2003, and pled guilty on October 10, 2003. Pursuant to a plea agreement, the government agreed to recommend credit for accepting responsibility and not to seek an upward departure from the sentencing guidelines.

A presentence report was then prepared, which found that the sentencing guideline range was 12 to 18 months. The report also suggested restitution for funeral expenses in the amount of $4,185. This sum had previously been paid by the Utah State Office of Crime Victims Reparations, so the report recommended repayment to the state office. The report also noted that Mr. Johnson's mother had requested reimbursement for $3,140 for the services of Navajo medicine man in connection with her son's burial. The defendant, through counsel, agreed to the restitution for direct funeral expenses, but objected to any restitution for the medicine man.

On January 21, 2004, Ms. Bedonie appeared before the court for sentencing. The court heard extensive allocution from Ms. Bedonie, Ms. Bedonie's mother, and Ms. Johnson, the victim's mother. Ms. Johnson explained why she had sought the services of the medicine man. She also explained how her son had provided critical financial support to her family before he was killed. Ms. Johnson testified "maybe I'm going to lose my trailer because of this [or] lose my car.... [L]ast month ... I didn't have any money to pay for butane. I was without butane for two weeks when it started snowing, and then I ran out of food."[2] Ms. Johnson also talked about Mr. Johnson's aspirations to become an artist and presented beautiful examples of the sketches Mr. Johnson had drawn.

After hearing all of the evidence, the court ordered from the bench that defendant Bedonie was to serve 18 months in prison. The court also tentatively ordered restitution for all funeral expenses, including expenses for the services of a Navajo medicine man. The court took the restitution issue under advisement to draft an opinion on the restitution issue. The next day, January 22, 2004, the court signed a judgment reflecting the 18–month sentence and the restitution of $7,325 and continued to work on an opinion explaining the restitution award.

On January 30, 2004, the court concluded that the Mandatory Victims Restitution Act[3] required restitution not only for funeral expenses but also for income lost by Mr. Johnson. In a written order, the court explained: "The court is legally obligated to impose [this] assessment [for lost

---

1. 18 U.S.C. § 1112(a) & (b); 18 U.S.C. § 1153.

2. Sentencing Hr'g, *United States v. Bedonie*, Jan. 21, 2004, Tr. at 13.

3. 18 U.S.C. §§ 3663A, 3664.

income] by 18 U.S.C. § 3663A, the *Mandatory* Victims Restitution Act." [4] Accordingly, the court entered an amended judgment awarding $50,000 for lost income restitution. This amount was "based on the factual conclusion that, but for the criminal offense of Ms. Bedonie, Mr. Johnson would have earned well in excess of that amount. In particular, Mr. Johnson was 22 when he was killed by the defendant, and undisputed facts at the sentencing hearing plainly established that he was a promising artist as well as employed in other activities." [5] To give the defendant an opportunity to contest this amount, the court then ordered the new judgment held in abeyance pending a hearing on the matter.

On February 5, 2004, the court entered an order giving notice that it was considering appointing its own expert pursuant to Rule 706 of the Federal Rules of Evidence to help determine the lost income suffered by Mr. Johnson and giving the parties an opportunity to object. One week later, the defendant filed an objection to the court appointing an expert witness, and on February 17, 2004, the government filed its own objection, calling any lost income in the case "too speculative" to award.

On February 18, 2004, the court rejected these objections and appointed an expert (Dr. Paul H. Randle) on lost income calculation. That order, published elsewhere,[6] concluded that the court has authority to investigate the lost income issue through an expert by virtue of Rule 706 of the

Federal Rules of Evidence, the inherent "general power of calling witnesses in aid of justice," and the procedural provision of the MVRA authorizing the court to appoint a special master to resolve restitution issues.[7] The court also invited the government to consider withdrawing its objection to the appointment of an expert in light of the government's obligations under the Victims Bill of Rights to make its "best efforts" to afford crime victims the "right to restitution." [8] The government later withdrew its objection to the expert and lost income restitution, but reserved its right to object to the amount of restitution. In a separate order, the court also rejected defendant Bedonie's argument that the investigation of restitution issues was too late, noting that the court has the power to hold open restitution issues for a period of 90 days after sentencing under the MVRA.[9]

On March 25, 2004, the court held a hearing at which Dr. Randle testified about lost income suffered by Mr. Johnson. He concluded that Mr. Johnson's lost income was somewhere between $433,562 and $850,959, depending on what assumptions one made. Dr. Randle also testified that, making the highly conservative assumption that Mr. Johnson would have earned no more than $1500 per year (the amount he had made selling art in high school), then Mr. Johnson's loss was $40,907. On April 15, 2004, the court held a further hearing at which the lost income issue was capably argued by counsel. Fol-

---

4. *See* Order Entering Amended Judgment, Holding Judgment in Abeyance, and Directing Briefing and a Hearing at 1, *United States v. Bedonie* (Jan. 30, 2004) (Dkt. No. 23–1).

5. *Id.* at 2.

6. *See United States v. Serawop*, 303 F.Supp.2d 1259 (D.Utah 2004).

7. *See id.* at 1260 (citing, *inter alia*, McCORMICK ON EVIDENCE § 8, at 17 (3rd ed.1984); 18 U.S.C. § 3664(d)(6)).

8. *See id.* at 1268 (citing 42 U.S.C. § 10606(b)).

9. *See* Order Rejecting Timing Objections to Appointment of an Expert on Restitution, *United States v. Bedonie*, 303 F.Supp.2d 1259, *id.* (citing 18 U.S.C. § 3664(d)(5)).

lowing that hearing, the court directed Dr. Randle to prepare revised calculations of the lost income suffered by Mr. Johnson in which Mr. Johnson's possible "consumption" was subtracted from the figures. These calculations produced a figure for lost income of between $76,783 and $561,038.

### B. United States v. Serawop.

The other consolidated case pending before the court also involves a homicide. At about 1:30 a.m. on November 3, 2002, defendant Redd Rock Serawop called the Bureau of Indian Affairs (BIA) Police Department and requested that an ambulance come to his residence in Fort Duchesne, Utah. He explained that the ambulance was needed to take his three-month-old daughter, Beyonce Serawop, to the hospital. Defendant Serawop was acting as her primary care-giver since the infant's mother, Ernestina Moya, had reported to the Duchesne County Jail the previous morning to begin serving a twelve-day jail sentence. (Ms. Moya and defendant Serawop had a co-habitation relationship.) Three-month-old Beyonce, her twenty-two-month-old brother Grant, six-year-old half brother Isaiah, and six-year-old cousin Angel were all in the home and under the defendant's care.

A few minutes later, Ute Tribal emergency medical staff arrived at the Serawop residence and took the baby and the defendant in the ambulance about seven miles to the Uintah Basin Medical Center in Roosevelt, Utah. Emergency medical staff noted that the infant had difficulty breathing.

Beyonce arrived at the hospital about ten minutes later, where emergency room physician Dr. Glenn Robertson and on-call pediatrician Dr. Gregory Staker were unable to resuscitate her. Dr. Staker performed a spinal tap which produced blood, suggesting that serious head trauma had

been inflicted on the infant. Dr. Staker quickly arranged a life-flight helicopter to Primary Children's Medical Center in Salt Lake City. Dr. Staker questioned defendant Serawop as to whether he was aware of any trauma suffered by Beyonce which would explain the serious head injury she had suffered. Defendant Serawop said that the victim's six-year-old half brother had told him that the baby had fallen during the evening. Beyonce Serawop was then flown by life-flight helicopter to Primary Children's hospital, where she was pronounced dead on arrival.

Ms. Moya was released from the Duchesne County Jail and repeatedly called defendant Serawop to question him about what had happened to Beyonce. Ms. Moya was suspicious that defendant Serawop had done something to injure their daughter. During one of the phone calls, defendant Serawop claimed that their two-year-old son had hit Beyonce in the head with his plastic drinking cup.

Investigative efforts then focused on ascertaining how Beyonce had been injured. On November 4, 2002, defendant Serawop reported to investigators that although he was not aware of any injuries suffered by his daughter during the evening of November 2nd and early morning of November 3rd, he was concerned that one of the other children in the home may have dropped the baby.

On November 14, 2002, during a subsequent interview with FBI Special Agent Ashdown, defendant Serawop acknowledged misleading investigators during his initial interview. Defendant Serawop now suggested that he had tripped over a shoe while carrying Beyonce in the bedroom of his residence around 12:30 a.m. on November 3, 2002, and that he had fallen on her head as he hit the floor.

On December 3, 2002, investigators videotaped defendant Serawop as he reen-

acted for investigators how he tripped and fell in his bedroom while carrying his daughter. Subsequent investigation established Beyonce's injuries were inconsistent with the fall as reenacted by defendant Serawop.

On February 7, 2003, the defendant voluntarily took a polygraph examination conducted by the FBI. The examiner concluded that defendant Serawop had been untruthful regarding his November 14, 2002, account of the fatal injuries suffered by his infant daughter. When told of this conclusion, defendant Serawop again revised his account and claimed that he had accidentally dropped his daughter while reaching for her bottle in the bathroom and that her head hit the sink counter as she fell. Defendant Serawop declined to take a further polygraph examination regarding this revised statement.

On May 7, 2003, Redd Rock Serawop was charged with second degree murder while within Indian Country.[10] The evidence at the four-day jury trial, including an autopsy report, established that Beyonce Serawop received multiple violent injuries which led to her death. The infant's skull was fractured in two places, one right rib was clearly fractured, and two left ribs appeared to be fractured as well. Statements from the victim's six-year-old half brother described an evening of tension and abuse in defendant Serawop's care. Beyonce's crying interrupted the defendant Serawop's television viewing, and he abused the infant on the couch in anger. Following the blow that led to Beyonce's death, defendant Serawop waited for approximately an hour before summoning medical help. The jury found that Serawop was guilty of the lesser included offense of voluntary manslaughter.

During the presentence interview, defendant Serawop revised his account yet again and frankly admitted that he was frustrated with Beyonce's crying around 12:30 a.m. on November 3, 2002, when he "lost it" and threw the child. Although his recollection of the details of what took place were not very clear, he believes the child's head struck the sink or the toilet in the bathroom, after which she cried briefly and became motionless. Defendant Serawop ultimately contacted the BIA police department for an ambulance about an hour after he threw his daughter.

A presentence report was prepared in the matter. With regard to victim impact, the report noted Ms. Moya's tremendous sadness about her daughter's death. Ms. Moya has participated in some grief counseling but acknowledges she has struggled with drug and alcohol abuse in an attempt to cope with the crime. Moreover, in addition to the obvious abuse to Beyonce, each of the other three children in the home that night witnessed terrible conduct on the defendant's part, with potentially serious repercussions to their normal childhood development.

After receiving the report, the court concluded that an expert would be of assistance in determining whether lost income restitution should be awarded for income that Beyonce would have earned but for her death at the hands of defendant Serawop. The court accordingly appointed Dr. Paul Randle to investigate this issue (in parallel with his investigation in the Bedonie case).

On March 25, 2004, the court held a hearing on sentencing and restitution issues in this case (along with the Bedonie case) and tentatively concluded that defendant Serawop should serve 10 years, the statutory maximum for voluntary manslaughter. The court then heard testimony from Dr. Randle concerning lost income

---

**10.** *See* 18 U.S.C. § 1111; 1153(a).

suffered by Beyonce. He concluded that Beyonce lost somewhere between $171,366 and $576,106 as the result of her death, depending on what assumptions were made. On April 15, 2004, the court held a further hearing at which restitution issues were well argued by counsel. Following that hearing, Dr. Randle prepared revised calculations of the loss suffered by Beyonce, in which he removed her possible "consumption" from the figures. These calculations produced a loss of between $30,349 to $765,118. Dr. Randle also conservatively calculated Beyonce's lost income based solely on the loss of the "stipend" that she was entitled to receive as a tribal member. Using the projected stipend amounts (between $80 and $100 a month), the projected lifetime loss was between $17,118 and $21,397.

## ANALYSIS

### I. The Court Must Order Restitution for the Violent Crimes Committed by Defendants Bedonie and Serawop.

#### A. The Mandatory Victim Restitution Act Applies to Bedonie's and Serawop's Crimes of Violence.

The court must order both defendants Bedonie and Serawop to pay full restitution if their cases are governed by the Mandatory Victims Restitution Act of 1996 [11] rather than its predecessor, the Victim and Witness Protection Act of 1982 (VWPA).[12] The "MVRA's primary purpose is to force offenders to 'pay full restitution to the identifiable victims of their crimes.' "[13] The Act firmly directs that "[n]otwithstanding any other provision of law, when sentencing a defendant convicted of [certain offenses] ... the court *shall* order ... that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate."[14] Thus, "Congress elected not merely to permit the trial court to order restitution in these cases, it affirmatively mandated restitution."[15]

The MVRA applies to property crimes, consumer product tampering crimes, and (relevant to this case) "crime[s] of violence, as defined in [18 U.S.C. § 16]" in which "an identifiable victim or victims has suffered a physical injury or pecuniary loss."[16] Defendant Serawop concedes that the MVRA governs restitution in his case. His crime—voluntary manslaughter—is obviously a crime of violence that produced physical injury, i.e., death. There is no doubt that full restitution is mandatory for him.[17] Defendant Bedonie, however, argues that her crime—involuntary manslaughter—is not covered by the MVRA but instead by the discretionary provisions of the VWPA. She concedes the obvious point that her actions produced physical injury (i.e., the death of Mr. Johnson). She argues, however, that involuntary manslaughter is not a "crime of violence" as defined in 18 U.S.C. § 16. That section defines a "crime of violence" as:

(a) an offense that has as an element the use, attempted use, or threatened

11. Pub.L. 104–132, Title II, § 201, 110 Stat. 1214, 1227–1236, *codified as* 18 U.S.C. §§ 3663A, 3664.

12. Pub.L. 97–291, § 4, 96 Stat. 1248, 1249–53, *codified as* 18 U.S.C. §§ 3663, 3664.

13. *United States v. Reano*, 298 F.3d 1208, 1211 (10th Cir.2002) (quoting S.Rep. No. 104–179, at 12 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 925).

14. 18 U.S.C. § 3663A(a)(1).

15. *United States v. Monts*, 311 F.3d 993, 1001 (10th Cir.2002), *cert. denied*, 538 U.S. 938, 123 S.Ct. 1605, 155 L.Ed.2d 342 (2003).

16. 18 U.S.C. § 3663A(c)(1)(A) and (B).

17. *See United States v. Checora*, 175 F.3d 782, 795 (10th Cir.1999) (applying MVRA to voluntary manslaughter case).

use of physical force against the person or property of another, or

(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.[18]

Bedonie pled guilty to involuntary manslaughter in violation of 18 U.S.C. § 1112(a), which provides "manslaughter is the unlawful killing of a human being without malice." The statute further distinguishes between "voluntary" and "involuntary" manslaughter, providing that "involuntary" manslaughter occurs "[i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." [19]

█ Defendant Bedonie argues that because involuntary manslaughter can be committed in various ways that, in her view, do not necessarily involve force, her crime is not one of violence. The court disagrees, finding that involuntary manslaughter is a crime of violence under 18 U.S.C. § 16(a). While the Tenth Circuit recently held in *United States v. Lucio–Lucio* that a mere conviction under a Texas DUI statute, standing alone, was not a crime of violence, that opinion specifically declined to address the question of whether a DUI causing injury or death was a crime of violence.[20] In an earlier decision, *United States v. Lujan,*[21] the Circuit held

that a California manslaughter conviction was a "violent felony" under the Armed Career Criminal Act, which uses defining language identical to the "crime of violence" definition in 18 U.S.C. § 16(a). California defines manslaughter as "the unlawful killing of a human being without malice." [22] The Tenth Circuit in *Lujan* found it unnecessary to consider the three forms of manslaughter in California—voluntary, involuntary, and vehicular. Instead, the Circuit simply stated that a California manslaughter conviction was "clearly" a violent felony.[23] Accordingly, under the controlling Tenth Circuit decision in *Lujan,* involuntary manslaughter is plainly a crime of violence.[24]

B. *Even if the Mandatory Victims Restitution Act Does Not Apply to Ms. Bedonie, the Court Would Impose the Same Restitution Under the Victim Witness Protection Act.*

█ Even if the court were to conclude that Ms. Bedonie's homicide was not a crime of violence and therefore not covered by the MVRA, the VWPA would still apply. Proceeding under the VWPA, the court would exercise its discretion to award exactly the same full restitution.

1. *The Need to Provide Restitution to Victims Is More Pressing than the Risk of Extending Court Proceedings.*

The MVRA tracks word for word many of the provisions in the earlier-enacted

18. 18 U.S.C. § 16.

19. 18 U.S.C. § 1112(a).

20. *See* 347 F.3d 1202 (10th Cir.2003) (reserving issue of whether pure DUI causing death is crime of violence).

21. 9 F.3d 890 (10th Cir.1993).

22. Cal.Penal Code § 192 (Deering 1993), *quoted in Lujan,* 9 F.3d at 891.

23. 9 F.3d at 891.

24. *Accord United States v. Moore,* 38 F.3d 977, 979–80 (8th Cir.1994); *but see Jobson v. Ashcroft,* 326 F.3d 367 (2nd Cir.2003) (disagreeing with *Moore* ). *Cf. Leocal v. Ashcroft,* —— U.S. ——, 124 S.Ct. 1405, 158 L.Ed.2d 76 (U.S.2004) (granting certiorari to resolve this issue).

VWPA, including the lost income and funeral expense provisions that are at issue here. One obvious salient difference between the two statutes is that restitution under the Mandatory Victims Restitution Act is *mandatory*, while under the Victim Witness Protection Act it is *discretionary*. In exercising its discretion under the VWPA, the court must consider both "the amount of the loss sustained by each victim as a result of the offense" and "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." [25] The court "*may* decline" to enter any order of restitution "[t]o the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution ... outweighs the need to provide restitution to any victims." [26] Considering all of the specified and other relevant factors, the court finds that it should exercise its discretion in favor of awarding restitution, rather than truncate the proceedings by declining to make such award.

The first factor the court is directed to consider in determining whether to make a restitution award is "the loss sustained" by the victim. For reasons explained later in this opinion, not only was the breath of life was lost when Mr. Johnson was killed by the defendant, but there were substantial financial losses.

The next factor the court must consider is "the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents." The presentence report in this matter indicates that defendant Bedonie lacks significant debts or assets, has no dependents, and "has the capacity to make

minimal monthly payments toward court-ordered fines or restitution." [27] The ability to make only minimal payments toward restitution is a factor weighing against further extending review of restitution issues.

Finally, the court is directed to consider "such other factors as the court deems appropriate." The court believes that several additional factors are relevant. This is a homicide case, involving the most serious possible harm known to the criminal law—the death of a victim. Because of the loss of life, doubts should be resolved in favor of taking the time to explore restitution issues. Moreover, the indigency of the victim's mother (the representative of the victim in this matter) combined with defendant Bedonie's lack of significant assets would make it difficult for her to file a civil suit seeking redress for the defendant's homicide. If lost income issues are not resolved here, they will apparently never be resolved.

A final point is also relevant to this issue—there is a compelling reason for considering every dollar of restitution that might be awarded to any victim here. Ms. Johnson testified at the January 21, 2004, sentencing hearing about the devastating financial consequences of the defendant's homicide, which deprived her of financial contributions from Mr. Johnson. As she credibly explained:

> To this day, I haven't been able to get caught up on my bills. I have to pay for my trailer and my car. I can't afford to pay for my propane, electricity and water payments, so I have been turning to the church to help me out. I also can't afford to buy personal needs, food and even to do my laundry.
>
> I also have a daughter who is in high school and she needs school supplies.

---

**25.** 18 U.S.C. § 3663(a)(1)(B).

**26.** 18 U.S.C. § 3663(a)(1)(B)(ii).

**27.** Presentence Report, *United States v. Bedonie,* at ¶¶ 37, 44.

And at the beginning of the school year, I couldn't even afford to buy her any clothes or any school supplies. We also have livestock that we can't afford to buy hay to feed them. Many times I have turned to my family for help, but they can only do so much. . . .

My bi-weekly income is around $200. Right now I only have one job and I work six days a week.[28]

In sum, after considering all the relevant factors, the court concludes that any prolongation and complication of sentencing that might result from considering restitution does not outweigh the need to provide restitution to any victims.

### 2. The Seventh Circuit's Contrary Analysis in United States v. Fountain is Not Persuasive.

In reaching this conclusion, the court is aware of a contrary analysis in the 1985 Seventh Circuit decision—*United States v. Fountain*[29]—a case cited prominently by defendant Bedonie. The Seventh Circuit's analysis is not controlling here and appears unpersuasive.

In *Fountain*, the Seventh Circuit held, over the strong dissent of Judge Swygert, that the VWPA did not permit a district court to conduct a hearing to determine whether to award restitution for *future* lost income for a victim of a homicide. The Circuit had no difficulty with awarding past lost income or, indeed, no conceptual difficulty with awarding future lost income. Instead, the Circuit was concerned solely with the burden to district courts in making such determinations. The Circuit explained the practical problem as follows:

Compensation for the loss of future earnings is quintessentially civil. The

reason is not merely historical, or conceptual; there is, indeed, no difference of principle between past and future earnings, so far as the purposes of criminal punishment are concerned. To disable a person from working, temporarily or permanently, is to deprive him of his human capital; it is a detail whether the consequence is to deprive him of earnings he would have had in the past or earnings he would have had in the future. The reason for treating past and future earnings differently is practical: the calculation of lost future earnings involves the difficult problem of translating an uncertain future stream of earnings into a present value. . . . It is not a problem met for solution in a summary proceeding ancillary to sentencing for a criminal offense.[30]

In view of this "practical" problem, the Circuit then held that the VWPA never permitted future lost income awards: "Obeying the statutory directive that 'the imposition of such order . . . not unduly complicate or prolong the sentencing process,' we hold that an order requiring a calculation of lost future earnings unduly complicates the sentencing process and hence is not authorized by the VWPA" unless such order were uncontested.[31]

Judge Swygert dissented on this issue. He saw no reason to adopt a per se rule barring restitution for future lost income whenever there was dispute: "Surely there are some victims whose future earnings are easily predictable, and surely district judges have sufficient competence and experience to expeditiously predict future earnings and discount to present value, despite the failure of the parties to agree on the necessary calculations."[32]

---

28. Sentencing Hr'g, *United States v. Bedonie*, Jan. 21, 2004, Tr. at 6–7, 13.

29. 768 F.2d 790 (7th Cir.1985).

30. *Id.* at 801–02.

31. *Id.* (citing 18 U.S.C. § 3579(d) (1984)).

32. *Id.* at 808 (Swygert, J., dissenting).

Judge Swygert also expressed his concern that the per se rule "will essentially repeal restitution for lost income [under the VWPA] because all calculations of future income can be 'contested.' " [33]

*Fountain* has now been effectively overruled by the MVRA for cases involving crimes of violence. But in other cases subject to the VWPA, it is potentially persuasive authority to consider. The Tenth Circuit does not appear to have discussed the issue presented in *Fountain,* leaving this court to determine in the first instance whether the Seventh Circuit is correct in holding that the VWPA blocks future lost income awards in all circumstances. Having carefully reviewed the relevant statutes, the court declines to follow the Seventh Circuit's analysis because it is at odds with the controlling statutory language.

The provision of the VWPA that the Seventh Circuit relied upon provides in full:

> To the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court *may* decline to make such an order.[34]

As the italicized word "may" indicates, the statute gives the district courts discretion in entering restitution awards. It would twist that term beyond recognition to read that discretionary statute as barring district courts from *ever* entering such orders in all cases involving issues of lost income.

More important, the Seventh Circuit's analysis seems incomplete; it apparently considers only the costs of extended restitution hearings, but not the benefits. No doubt, determining lost future income will complicate and prolong some sentencings. Those costs, however, should not be overstated. This case can serve as a convenient illustration. To determine the lost income of two victims in two separate homicide cases, the court held one evidentiary hearing of approximately three hours, followed by another hearing of approximately two-and-a-half hours to hear arguments of counsel on the issues involved. These hearings would have been considerably shorter with the benefit of a Tenth Circuit opinion establishing controlling legal principles in the area. The court also was required to spend $1725 to retain the services of an expert for both cases.

Weighed against the costs of complicating and prolonging sentencing hearings is the fact that many crime victims and their families will benefit from larger restitution awards. The Seventh Circuit's sweeping rule applies to a wide range of cases, including cases in which a victim has been disabled or even killed by a violent criminal. As suggested by Ms. Johnson's situation, at least some (if not most) of these crime victims may be in desperate financial circumstances where literally every dollar could make a real difference to them. It makes little sense to give a wooden reading of the statute that all victims—no matter how badly victimized or how urgently in need of financial recompense—will never obtain lost income restitution.

This analysis is supported by the plain language of the statute, which mandates consideration of victims' individual circumstances. The statute requires the court to "determine[ ]" whether the costs of longer hearings "outweigh the need to provide restitution to any victims." The Seventh Circuit does not explain how its per se

---

**33.** *Id.* (Swygert, J., dissenting).

**34.** 18 U.S.C. § 3663(a)(1)(B)(ii) (emphasis added), *recodified from* 18 U.S.C. § 3579(d) (1985).

rule gives effect to the statutory directive to "determine" crime victims' needs. Indeed, with the benefit of 20/20 hindsight, it may be that cases like *Fountain* triggered Congress' decision to pass the Mandatory Victims Restitution Act precisely to make sure that courts fully considered the victims' side of the cost-benefit equation. Accordingly, the court finds *Fountain* unpersuasive and refuses to follow it here. Furthermore, the court concludes that, were it to proceed under the VWPA, it would have discretion to award future lost income restitution and that its discretion should be exercised to determine the amount of such an award.

### 3. The Court Would Order Full Restitution Under the VWPA.

If the court were proceeding under the VWPA rather than the MVRA, there would remain the issue of whether the court would order the same, full restitution that it would order under the MVRA. In several VWPA cases decided more than a decade ago, the Tenth Circuit held that ordering indigent defendants to pay full restitution was improper. For example, in 1991 in *United States v. Rogat,* the Circuit explained that "[a]lthough a defendant's indigency is not a bar to restitution, ... [t]he possibility of repayment ... cannot be based solely on chance." [35] In the 1992 in *United States v. McIlvain,* the Circuit noted the principle that potential for restitution cannot be based on mere chance and vacated a restitution order because district court failed to take into consideration the defendant's ability to pay.[36] In a similar

decision in 1992, *United States v. Grimes,* the Circuit vacated a restitution order because of lack of evidence that the "defendant had the capacity to earn sufficient income following release that would permit [restitution] payments." [37] Under these cases, it might be argued that, were the court to proceed under the VWPA rather than the MVRA, it would need to award a smaller sum for restitution in light of defendant Bedonie's limited ability to pay.

The court finds that those earlier Tenth Circuit decisions are no longer good law. Congress overruled these decisions and others like them in other circuits [38] when it passed the MVRA. The MVRA not only added new mandatory restitution provisions for crimes of violence, but also consolidated the procedures for determining and enforcing restitution awards. The relevant legislative history explains that the MVRA "has the further purposes of establishing one set of procedures for the issuance of restitution orders in Federal criminal cases.... [T]his legislation is needed to replace an existing patchwork of different rules governing orders of restitution under various Federal criminal statutes with one consistent procedure." [39]

The new consolidated procedures apply to both the MVRA and the VWPA.[40] One of these newly consolidated procedures specifically directs that courts must *not* consider the financial circumstances of a defendant in determining restitution: "In each order of restitution, the court *shall order* restitution to each victim in the *full*

---

**35.** 924 F.2d 983, 985 (10th Cir.1991), *cert. denied,* 499 U.S. 982, 111 S.Ct. 1637, 113 L.Ed.2d 732 (1991).

**36.** 967 F.2d 1479, 1481 (10th Cir.1992).

**37.** 967 F.2d 1468, 1473 (10th Cir.1992), *cert. denied,* 506 U.S. 927, 113 S.Ct. 355, 121 L.Ed.2d 269 (1992).

**38.** *See, e.g., United States v. Remillong,* 55 F.3d 572 (11th Cir.1995).

**39.** S.Rep. No. 104–179, at 12 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 925, quoted in *Reano,* 298 F.3d at 1212.

**40.** 18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d).

*amount* of each victim's losses as determined by the court and *without consideration of the economic circumstances of the defendant.*[41] The procedures then go on to provide that, once full restitution has been ordered, the economic circumstances of the defendant are relevant to determining the subsidiary question of the schedule for paying restitution.[42] In light of the new clear congressional directive, the court would proceed in the same fashion under either the MVRA or the VWPA— first ordering full restitution and then considering the economic circumstances of the defendant in arranging a payment schedule.

For all these reasons, the court finds that full restitution must be awarded against both defendants Bedonie and Serawop.

## II. Bedonie and Serawop Must Pay Restitution for the Lost Income of their Victims.

### A. The Deceased—Mr. Johnson and Beyonce Serawop—Are Entitled to Restitution as "Victims" of the Homicide Offenses Against Them.

Having concluded the court must award full restitution, the issue then arises as to who is the "victim" entitled to restitution. It seems almost self-evident that a person who is murdered is the victim of a homicide offense.[43] But because the issue seems to be contested, it may be useful to explore the issue briefly.

### 1. Lost Income Is Properly Awardable to Mr. Johnson as the "Victim" of a Homicide.

Mr. Johnson is the victim of defendant's Bedonie's crime. The MVRA defines "victim" as:

[A] person *directly and proximately harmed* as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. In the case of a victim who is under 18 years of age, incompetent, incapacitated, or *deceased*, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, *may assume the victim's rights under this section* . . . .[44]

Under this provision, the person killed in a homicide case is a victim. Obviously, as provided in the first sentence of the definition, someone who is murdered is "directly and proximately harmed" by the offense. The second sentence of the definition does not alter that conclusion. The second sentence lists certain persons who "may *assume* the victim's rights" under the MVRA when a victim is "deceased," including a "representative of the victim's estate." But these persons do not become the victim; they merely represent the victim under the statute.[45]

---

41. 18 U.S.C. § 3664(f)(1)(A) (emphasis added); *see United States v. Johnson*, 183 F.3d 1175, 1179 (10th Cir.1999).

42. 18 U.S.C. § 3664(f)(2).

43. *See generally* Douglas E. Beloof, Victims in Criminal Procedure 41–44 (1999).

44. 18 U.S.C. § 3663A(a)(2) (emphases added).

45. *See United States v. Pizzichiello*, 272 F.3d 1232, 1241 (9th Cir.2001), *cert. denied*, 537 U.S. 852, 123 S.Ct. 206, 154 L.Ed.2d 84 (2002).

■ This distinction is important because defendant Bedonie raises several arguments predicated on the assumption that the victim in her case is Mr. Johnson's *estate* rather than Mr. Johnson himself. To be sure, there may be a close connection between the estate and the victim. But to treat the estate as the victim would contravene the plain language of the statute which, as just noted, merely allows a "representative of the estate" to "assume" the victim's rights, not to actually become the victim. Moreover, Bedonie's reading of the statute assumes that in homicide cases the victim will always be the estate. Such a reading would give no effect to another provision, which allows the court to appoint "any other person" found to be "suitable" to assume the victim's rights. In this case, the court will appoint Ms. Johnson—the victim's mother who allocated eloquently at the sentencing hearing—as the suitable person to represent Mr. Johnson. That appointment is not conditioned on any connection between Ms. Johnson and the victim's estate. Indeed, the court could make such an appointment under the statute if Mr. Johnson had been only incapacitated rather than killed.

Ms. Bedonie points to one other provision in the statute as suggesting that the victim in her case is Mr. Johnson's estate, not Mr. Johnson himself. The opening paragraph of the MVRA directs where payment of restitution is to be made:

Notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to, or in the case of a misdemeanor, in addition to or in lieu of, any other penalty authorized by law, that the defendant *make* restitution to the victim of the offense or, *if the victim is deceased, to the victim's estate.*[46]

This payment provision does not define who is "the victim," a subject addressed in the definitional paragraph discussed above. Instead, this provision simply explains to whom the defendant is to pay or "make" the restitution—to the estate in cases where the victim is deceased, as otherwise the payments might go nowhere.

For all these reasons, Mr. Johnson is the victim in Ms. Bedonie's case.

### 2. The Court Need Not Reach the Issue of Whether Ms. Johnson is Also a Victim of the Offense.

Mr. Johnson's mother, Ms. Johnson, may also be a "victim" of defendant Bedonie's crime in her own right. As just discussed, the salient provision of the MVRA defines "victim" as a person "directly and proximately harmed as a result of the commission of an offense."[47] In this case, Mr. Johnson was obviously directly and proximately harmed when he was killed. But nothing in the MVRA requires that restitution be limited to a single victim, and Ms. Johnson may well have been directly harmed also.

Ms. Johnson directly lost financial support from her son. As she credibly explained in a letter provided to the court:

I am a single parent. My son Brian started work right after his graduation to help me out with our financial commitments. With Brian's help, our family financial status was fine. Brian was also a talented artist. With the sale of his arts, it really helps with the bills. After Brian's death, my bills started to accumulate. Even when I got a second job, it's still not enough....

I'm getting behind on my bills of 2 to 3 months. These are my necessities, my trailer, our water and light bills, food, etc. With the stra[in] of my daily survival, I'm developing health problems. I

---

**46.** 18 U.S.C. § 3663A(a)(1) (emphasis added).

**47.** 18 U.S.C. § 3663A(a)(2).

am in need of help. If only I can get my bills up to date and extra cash, then I can start off again.[48]

The Tenth Circuit has held that a financial loss stemming from a homicide can create "victim" status under the MVRA. In *United States. v. Checora,*[49] the Tenth Circuit cited the MVRA's direct-and-proximate-harm definition of "victim" and held a homicide victim's sons qualified as victims under the statute.[50] The court explained that the sons had "been directly and proximately harmed as a result of their father's death because they have lost, among other things, a source of financial support."[51] Likewise in this case, Ms. Johnson would appear to have directly lost a vital source of financial support and therefore might qualify as a "victim" under the statute for that reason alone.

The court, however, does not rest any determination that Ms. Johnson is a victim solely on this monetary ground. As was apparent during Ms. Johnson's allocution, the financial loss from the defendant's crime was only a small part of the harm. Much more significant was the emotional trauma inflicted on Ms. Johnson from the loss of her son. Ms. Johnson undertook the difficult task of explaining to the court what it was like to lose her son:

> People may think and say that this happened 21 months ago. I should be over it by now. But to me it seems like yesterday. The pain and loss is still in my heart. As I am sitting here today, my heart is filled with tears for the loss of my son. . . . People will tell you to hang on, or to give it time, and things will get better. But those are just words. As you go on with your livelihood, you try to encourage yourself to continue as before, but it doesn't work that way. Every day you expect your child to walk through the door and tell you about his day, who he met, and who he talked to, what he ate, and what new things he has learned from somebody he has met along the way. . . . How do you deal with the pain of losing your child. It's not easy. . . .
>
> To this day and forever I know that losing someone you love a lot is hard to accept and it comes with a pain that is hard to bear at times. But life goes on. I'll always miss him and wish I could see him again, but as we all know that isn't possible. So now all I have is just memories of him.[52]

This clear psychological harm to Ms. Johnson would seem to qualify her as a victim under the statute. As two leading experts on restitution have written, "in cases of murder or manslaughter, *direct injury* is experienced by the victim's family through loss of a member."[53] Moreover, the MVRA only requires that a person be "directly and proximately harmed" by an offense. Nothing in the statute requires that the "harm" be a financial and physical injury. To the contrary, the term "harm" is conventionally defined as embracing both "physical and mental damage."[54] Consistent with that understanding, the MVRA recognizes that restitution may be appropriately ordered for, among

---

**48.** Letter from Ms. Johnson to Whom It May Concern (July 20, 2003) (provided to probation office and counsel during preparation of the presentence report).

**49.** 175 F.3d 782 (10th Cir.1999).

**50.** *Id.*

**51.** *Id.*

**52.** Sentencing Hr'g, *United States v. Bedonie,* Jan. 21, 2004, Tr. at 4–5, 13.

**53.** Charles F. Abel & Frank H. Marsh, PUNISHMENT AND RESTITUTION: A RESTITUTIONARY APPROACH TO CRIME AND THE CRIMINAL 161 (1984) (emphasis added).

**54.** WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1034 (1993) (first definition).

other things, "psychiatric[ ] and psychological care." [55] To be sure, the statute is limited in that it does not authorize some open-ended award of restitution for pain and suffering or emotional distress. But the only issue at this juncture is whether Ms. Johnson qualifies as a "victim," not the full dimensions of what kind of restitution should be paid. Based on the credible statement given by Ms. Johnson in open court, it would appear that she has been directly and proximately harmed—indeed, grievously harmed—by the defendant's homicide that deprived her of her first-born son.

Nonetheless, the court finds it unnecessary to finally determine whether Ms. Johnson is a victim under the MVRA. So far as the court can tell, such a determination would not change the *amount* of restitution to be awarded. Ms. Johnson had not alleged any categories of restitution above and beyond those that would be awarded to her son. At most, a determination about her status might have changed the *distribution* of restitution to be awarded. If she is a victim, she might have suffered some lost income by losing a source of financial support. But the court is already going to make a full award for lost income to Mr. Johnson, so any award to Ms. Johnson would have to be subtracted to avoid double counting. Since Ms. Johnson will apparently administer Mr. Johnson's estate, any change in distribution from Mr. Johnson to Ms. Johnson would be little more than a bookkeeping change. Accordingly, the court concludes that it need not determine whether Ms. Johnson is a victim in this matter.

### 3. Lost Income Is Properly Awardable to Beyonce Serawop as the "Victim" of a Homicide.

Defendant Serawop has also objected to defining Beyonce as a "victim." On this issue, his arguments largely parallel those of defendant Bedonie and are rejected for the same reasons. Beyonce Serawop was "directly and proximately" harmed when her father smashed her head in a fit of rage. Beyonce obviously qualifies as a victim in her own right. To assume her rights during the proceedings, the court finds Beyonce's mother—Ms. Moya—is a suitable representative. Ms. Moya testified at trial and at sentencing spoke eloquently about the pain of losing her daughter. She is the logical representative of her daughter.

### B. The MVRA Requires a Lost Income Award in Homicide Cases.

██ Having concluded that the MVRA requires the court to order the defendants to pay full restitution and that Mr. Johnson and Beyonce Serawop are the victims of the defendants' offenses, the court must next determine what is embraced by the concept of "full" restitution. The court concludes that it is required to enter an order of restitution covering the lost income of the Mr. Johnson and Beyonce Serawop. Indeed, the MVRA requires such an award in all cases in which the violent death of a victim has lead to lost income.

The relevant provisions of the MVRA read:

The order of restitution shall require that such defendant—

. . .

(2) in the case of an offense resulting in *bodily injury* to a victim—

(A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including non-medical

---

**55.** 18 U.S.C. § 3663A(b)(2)(A).

care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

 (B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

 (C) *reimburse the victim for income lost by such victim as a result of such offense;*

(3) in the case of an offense resulting in *bodily injury that results in the death* of the victim, pay an amount equal to the cost of necessary funeral and related services; and

(4) in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense.[56]

Defendant Serawop argues that these provisions do not envision lost income awards in homicide cases.[57] His reading starts with subsection (b)(2)(C), which provides that "in the case of an offense resulting in *bodily injury to a victim*" the court shall order restitution to "reimburse the victim for income lost by such victim as a result of such offense."[58] On the other hand, subsection (b)(3) provides that "in the case of an offense resulting in *bodily injury that results in the death of the victim*" the court shall order restitution in "an amount equal to the cost of necessary funeral and related services."[59] Because subsection (b)(3) explicitly requires the court to order restitution to cover the cost of necessary funeral and related services

in criminal cases involving a death, defendant Serawop concludes that the more general lost income provisions of subsection (b)(2) are not applicable in homicide cases.

Defendant Serawop's position contradicts logic, the purposes of the MVRA, and the plain language of the statute. To find the MVRA's lost income provisions inapplicable in homicide cases would defy logic and would lead to the perverse result that murderers would usually pay markedly less restitution than criminals who only assault and injure their victims. Under such a reading, the murderer would pay only funeral expenses, while the assaulter would pay for lost income, a potentially much larger sum. Such a result would contradict a core purpose of restitution, which is to "ensure that the offender realizes the damage caused by the offense and pays the debt owed to the victim as well as to society."[60]

Moreover, reading the statute to block lost income awards in homicide cases would conflict with the clear intention of the MVRA: to force offenders to " 'pay full restitution to the identifiable victims of their crimes.' "[61] Income is plainly one of the things lost by victims when they are murdered. Indeed, the legislative history reveals clear congressional concern about the failure of federal courts to order restitution in homicide cases. In opening the hearings on the bill that became the MVRA, Senator Hatch critically observed that judges ordered restitution in "only 20.2% of federal criminal cases during fis-

---

**56.** 18 U.S.C. § 3663A(b).

**57.** *See* Def. Reply Mem. Regarding Future Lost Income Restitution, Apr. 12, 2004 (Dkt. No. 88–1).

**58.** 18 U.S.C. § 3663A(b)(2)(C) (emphasis added).

**59.** 18 U.S.C. § 3663A(b)(3) (emphasis added).

**60.** *Reano*, 298 F.3d at 1212.

**61.** *Id.* at 1211 (quoting S.Rep. No. 104–179, at 12 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 925).

cal year 1994 ... [including only] 27.9% of all murders." [62]

Such a conclusion would also flout the plain language of the MVRA. The statute expressly directs judges to require a convicted defendant to pay restitution for income lost "in the case of an offense resulting in bodily injury to a victim." [63] An offense that results in death would plainly be an offense resulting in bodily injury. Death is simply the most serious form of bodily injury and in no way eliminates the appropriateness of a restitution award.

Confirming this reading of the statute is the Tenth Circuit's decision in *United States v. Checora*. [64] In that case, the defendants murdered a man who had two sons. This district court ordered the defendants to pay $5,000 in restitution to the Utah State Division of Child and Family Services, who had custody of the children. The court agreed that the sons were "victims" under the MVRA because they had "lost, among other things, a source of financial support." [65] The only way that "a source of financial support" can be the basis for a restitution award in a homicide case is through the lost income provision. To be sure, the Tenth Circuit ultimately reversed and remanded that restitution award for further consideration, but solely on the ground that there was insufficient evidence in the record to conclude that the state agency was actually the proper guardian of the child. On remand, this court appointed a guardian to collect and spend the $5,000 for the two boys whose father had been murdered. [66] Thus, *Checora* holds that lost income is recoverable in a homicide case.

The Fifth Circuit has also rejected defendant Serawop's position. In *United States v. Razo–Leora*, [67] the Circuit upheld a lost income award of $100,000 to a widow whose husband was murdered. Apparently proceeding under the "income lost" language in the VWPA which is essentially identical to the MVRA, [68] the Circuit noted that the victim was in his twenties when he was murdered and might well have earned considerably more than that over his life. The Circuit approved the lost income award, explaining:

> The $100,000 award to his widow is therefore relatively conservative and assumes legitimate income by Garcia of only $5000 per year with a work life expectancy of only twenty years. Razo–Leora points to no countervailing evidence in the record. We conclude that the award has adequate support. [69]

The Fifth Circuit also approved a lost income award in *United States v. Jackson*, [70] although the court remanded for further evidentiary findings. *Jackson* involved defendants who kidnaped then murdered a victim. The district court ordered restitution to the victim's estate in the amount of $1,250,000 because of concern

---

**62.** *Mandatory Victim Restitution: Hearing on S.173 Before the Senate Committee on the Judiciary*, November 8, 1995 (Statement of Senator Orrin Hatch), *available at* 1995 WL 11869323.

**63.** 18 U.S.C. § 3663A(b)(2).

**64.** 175 F.3d 782 (10th Cir.1999).

**65.** *Id.* at 795.

**66.** *United States v. Checora*, 79 F.Supp.2d 1322 (D.Utah 2000).

**67.** 961 F.2d 1140 (5th Cir.1992).

**68.** *Compare* 18 U.S.C. § 3663(b)(2)(c) *with* 18 U.S.C. § 3663A(b)(2)(c).

**69.** 961 F.2d at 1146.

**70.** 978 F.2d 903 (5th Cir.1992), *cert. denied*, 508 U.S. 945, 113 S.Ct. 2429, 124 L.Ed.2d 649 (1993).

that the defendants might someday profit from a book about the highly publicized case.[71] The Fifth Circuit stated that "the district court has the authority to order the defendants to pay the victims' estate an amount equal to victims' lost income."[72] Nevertheless, the court remanded for further proceedings, because the district court had not made any factual findings concerning the amount of the victim's losses; rather than focus on the victim, the district court based its calculations on the defendants' prospective income.[73]

A final supporting decision on lost income comes from the U.S. District Court for the Eastern District of New York. In an arson case, *United States v. Ferranti*,[74] the court awarded total restitution exceeding $1.4 million, including more than $900,000 based on the future lost earnings of a firefighter killed putting out the blaze.[75]

In sum, in light of the structure of the MVRA and the supporting case law, the lost income provisions of subsection (b)(2) should be read as applying to cases involving not only injury but also death, in addition to which the funeral expense provisions of subsection (b)(3) apply in cases involving death. Under this interpretation of the MVRA, therefore, this court is not only permitted but *required* to order the

defendants here to pay restitution to the victim for "income lost by such victim as a result of such offense."

### C. The MVRA Requires an Award for Both Past and Future Lost Income.

Defendant Bedonie does not seriously contest that lost income awards are proper in cases involving crimes of violence. Instead, her main contention is that the court cannot order restitution for *future* lost income of a crime victim.[76] Her argument rests on the MVRA's language allowing a court to order a defendant to "*reimburse* the victim for *income lost* by such victim as a result of such offense."[77] She contends that the "income lost" does "not logically apply to income which the victim may lose in the future, especially in light of the use of the word 'reimburse,' which implies payment only for expenses already incurred."[78]

While creative, defendant Bedonie's argument is unsound. She seems to draw a distinction between *past* and *future* income. Yet, at the conceptual level, there is "no difference of principle between past and future earnings, so far as the purposes of criminal punishment are concerned."[79] Moreover, "lost income" is a phrase frequently used in court opinions around the country in tort cases. Plaintiffs frequently recover "lost income" damages, which include future lost income.[80] Congress pre-

---

71. *Id.* at 914.

72. *Id.* at 915.

73. *Id.*

74. 928 F.Supp. 206 (E.D.N.Y.1996).

75. 928 F.Supp. at 224 (Weinstein, J.), *aff'd without discussion of restitution issue sub nom. United States v. Tocco*, 135 F.3d 116 (2nd Cir.1998).

76. Def.'s Mem. in Opp. to Award of Future Lost Income as Restitution at 11–16, *United States v. Bedonie*, Mar. 5, 2004 (Dkt. No. 33–1).

77. 18 U.S.C. § 3663A(b)(2)(C) (emphasis added).

78. Def.'s Mem. in Opp. to Award of Future Lost Income as Restitution at 11, *United States v. Bedonie*, Mar. 5, 2004 (Dkt. No. 33–1).

79. *Fountain*, 768 F.2d at 801.

80. *See, e.g., Tsai v. Chang*, 2001 WL 717807, at *10 (Tex.App.2001) (upholding damage award for future lost income and rejecting claim that such award is "speculative and barred as a matter of law"); *Trifad Entertainment, Inc. v. Anderson*, 306 Mont. 499, 36 P.3d 363, 370 (2001) (remanding for consid-

sumably was aware of this background when it legislated and, accordingly, the words it chose should be construed in this light.[81]

Nor does the selection of the word "reimburse" necessarily imply a backward focus. To be sure, one can be "reimbursed" for losses already suffered. But in addition, one can be "reimbursed" by being restored or made whole. Thus, *Black's Law Dictionary* defines the verb "reimburse" as "[t]o pay back, *to make restoration*, to repay that expended; to indemnify, or *to make whole.*"[82] A victim of a crime is obviously not "restored" or "made whole" unless she is put back to the same position she was in before the crime. A victim of a violent crime who loses her ability to work because of criminal violence suffers losses well into the future.

If any doubt remained on the issue, Congress has resolved it by using a phrase that is very much forward looking: Congress has directed mandatory restitution for "income lost by such victim *as a result of* such offense."[83] Income losses that "result" from an offense are necessarily losses that occur at some future time. It could hardly be otherwise, as crimes do not harm victims retroactively but instead from that time forward.

■ Defendant Bedonie apparently concedes that Congress has directed courts to award lost income from the time of the crime through sentencing. Any other position would be nonsensical, as it would effectively read the lost income restitution provision out of the statute. But the net result of this concession is that Bedonie must awkwardly interpret the MVRA as permitting lost income awards only from the crime through sentencing, but not thereafter. This curious interpretation would produce significant variance in restitution awards in otherwise identical cases based on such happenstance as the length of time to investigate the case, the diligence with which it is prosecuted, and rapidity with which the court holds the restitution hearing. The possibility of variance would be particularly pronounced in homicide cases, where there is no statute of limitation[84] and where investigation and prosecution can take considerable time.[85] In this case, for example, Bedonie apparently concedes that the court could order restitution for lost income for two years—from the date of the homicide (April 19, 2002) through the date of this order. Making restitution awards turn on such fortuitous factors hardly seems to square with the congressional intent to make criminals " 'pay full restitution to the identifiable victims of their crimes.' "[86] Accordingly, the court finds that the plain language of the MVRA requires awards of all lost income resulting from the offense

---

eration of damages including "any future lost income and profits"); *Woodger v. Christ Hosp.*, 364 N.J.Super. 144, 834 A.2d 1047, 1049–50 (2003) (upholding "future loss of income award"); *Johnson v. Lanoix*, 847 So.2d 1283, 1286–1289 (La.App. 5 Cir.2003) (finding abuse of discretion by trier of fact in failing to award "special damages of $11,433.00 in income lost").

**81.** *See United States v. Meade,* 175 F.3d 215, 218 (1st Cir.1999).

**82.** BLACK'S LAW DICTIONARY at 1287 (6th ed.1990).

**83.** 18 U.S.C. § 3663A(a)(2)(C) (emphasis added).

**84.** *See, e.g., Santiago v. Spencer,* 346 F.3d 206, 210 (1st Cir.2003).

**85.** *See, e.g., United States v. Lee,* 108 F.3d 1370 (2nd Cir.1997) (Table Opinion), *available at* 1997 WL 138903, *2 (awarding lost income restitution to murder victim for seven-year period between time of murder and sentencing).

**86.** *Reano,* 298 F.3d at 1212 (quoting S.REP. No. 104–179, at 12 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 925).

at the time of sentencing, both losses that have occurred in the past and that will occur in the future.

The Tenth Circuit decision in *United States v. Checora*[87] is consistent with this analysis. In discussing the $5,000 lost income award in that case, the Circuit did not appear to find it relevant whether the $5,000 was past or future income. Likewise implicitly rejecting the argument are previously-discussed decisions in *Razo–Leora, Jackson,* or *Ferranti,* all of which awarded restitution for future lost income.

Defendant Bedonie does not effectively distinguish these cases, but relies instead on two cases: the Tenth Circuit's decision in *United States v. Julian* and the Ninth Circuit's decision in *United States v. Dayea.* Neither case is pertinent to the issues presented here.

In *United States v. Julian,*[88] the Tenth Circuit considered a sex offender's claim that he should not be required to pay restitution for the victim's future counseling expenses. The district court had ordered such restitution under a special restitution statute for sex crimes involving children, which provides for mandatory restitution of "the full amount of the victim's losses," including "any costs incurred by the victim" for "medical services relating to physical, psychiatric, or psychological case." [89] The Circuit held that the trial court was authorized to award restitution for future counseling expenses, which seemingly undercuts defendant Bedonie's argument here. Bedonie, however, seizes on a statement in the opinion that the

provision in the sex offender restitution statute is "much broader" than the MVRA.[90] Of course, since the MVRA was not at issue in *Julian,* the Circuit had no occasion to discuss the MVRA's precise parameters. More important, read in context, the Circuit's statement about the sex offender statute being "broader" concerned the counseling expenses at issue there [91]—not the lost income issues at stake here.

Defendant Bedonie also relies on a case from the Ninth Circuit: *United States v. Dayea.*[92] There, the Ninth Circuit overturned a restitution award made to the widow of Arizona police officer for the lost salary of her husband under the VWPA. The Circuit's rationale was quite narrow. The Circuit merely held that the widow "did not suffer bodily injury and therefore was not eligible for [lost income] restitution" in her own right.[93] The Circuit did not address the issue presented here— whether a victim who has been injured (indeed, killed) can be awarded lost income restitution. Underscoring the limits of its holding, the Circuit remanded for further proceedings on restitution issues, explaining: "Our decision to reverse this particular order does not mean that no restitution is appropriate in this case. At resentencing, the court may find it appropriate to order restitution for any victims who have suffered losses compensable under § 3663." [94] Thus, *Dayea* does not preclude awarding lost income to a victim of a homicide offense. In any event, it is also may be relevant to note that the Ninth Circuit analysis seems in some tension with Tenth

---

**87.** 175 F.3d 782 (10th Cir.1999).

**88.** 242 F.3d 1245 (10th Cir.2001).

**89.** *Id.* at 1246.

**90.** *Id.* at 1247.

**91.** *See id.* (contrasting language in sex offender restitution statute with language in the MVRA regarding restitution "equal to the cost

of necessary medical and related professional services").

**92.** 73 F.3d 229 (9th Cir.1995).

**93.** 73 F.3d at 231.

**94.** 73 F.3d at 232.

Circuit's analysis in *United States v. Checora,* which sanctioned lost income restitution for two young sons of a homicide victim even though they had not themselves suffered bodily injury. For all these reasons, *Dayea* is not instructive here.

Defendant Serawop has also objected to a lost future income award in his case. He raises two arguments akin to Bedonie's: first, that any lost income for a three-month-old child would be speculative; and, second, that any lost income would not be a "direct harm" from the offense.

The first objection is essentially a factual claim that the evidence is insufficient to support a lost income award. As explained below, that objection fails in light of the evidence in this case.

The second objection is a legal one, stemming from the Ninth Circuit's opinion in *United States v. Cummings.*[95] *Cummings* held that "there must be a close connection between the restitution ordered and the injury sustained from the behavior" and that "a restitution order must be based on losses *directly resulting* from the defendant's criminal conduct."[96] Defendant Serawop reads this language as creating some sort of free-standing requirement of "direct" harm that must be met before the court can order restitution and argues that the requirement is not met here.

Defendant Serawop's argument is based on analysis of a Ninth Circuit opinion that is not directly controlling here, and the court finds his argument flawed for several reasons. First, the only place where the court sees the MVRA imposing any kind of directness requirement is in its definition of "victim." The MVRA defines a "victim" as "a person *directly and proximately*

*harmed* as the result of the commission of an offense."[97] Here, it is undisputable that Beyonce Serawop was "directly" harmed when she was killed by defendant Serawop. Any further requirement of "directness" is not in the statute, and the court will not engraft such an artificial limitation.

Second, defendant Serawop's argument appears to conflate two separate concepts: *future* harm and *indirect* harm. Defendant Serawop seems to contend that because Beyonce Serawop's lost income would have occurred about 18 years into the future, it somehow becomes merely "indirect" and therefore not awardable. This analysis is incorrect. As a clarifying illustration, consider a defendant who in 2004 fraudulently destroys a $100,000 financial instrument payable to the victim in the year 2022. Assuming that the destroyed instrument is irreplaceable, the victim has been directly harmed in the year 2004, even though payment would not have been received until some time in the future. To be sure, the loss to the victim is likely less than $100,000, as that future sum must be discounted to its present value. But it is impossible to contest the fact that the victim was directly harmed by the defendant in 2004. Similarly here, there is no doubt that Beyonce's ability to earn future income was destroyed by the defendant when he killed her. The only remaining issue is the value of that future harm, a point considered below.

In sum, the language of the MVRA and relevant case authority demonstrate that in a case involving a crime of violence, the court is empowered—indeed, required—to award restitution for lost income, including both past and future lost income.

---

**95.** 281 F.3d 1046 (9th Cir.2002), *cert. denied,* 537 U.S. 895, 123 S.Ct. 179, 154 L.Ed.2d 162 (2002).

**96.** *Id.* at 1052 (emphasis added).

**97.** 18 U.S.C. § 3663A(a)(2) (emphasis added); *see also United States v. Nichols,* 169 F.3d 1255, 1278 (10th Cir.1999)(discussing this provision).

### D. The MVRA Should be Interpreted Broadly as a Remedial Measure Rather than Narrowly Under the Rule Lenity.

For all the reasons explained above, the court finds that there is nothing ambiguous about the MVRA and that it mandates an award of lost future income for both Mr. Johnson and Beyonce Serawop. The defendants in both cases, however, argue that the MVRA is ambiguous and that the "rule of lenity" requires the court to construe the statute in their favor. In support of their argument, both defendants point to the Supreme Court's decision in *Hughey v. United States*,[98] which held that restitution under the VWPA could not extend to uncharged crimes. In the course of reaching that holding, *Hughey* stated:

> Even were the statutory language regarding the scope of a court's authority to order restitution ambiguous, long-standing principles of lenity, which demand resolution of ambiguities in criminal statutes in favor of the defendant, *Simpson v. United States*, 435 U.S. 6, 14–15, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978) (applying rule of lenity to federal statute that would enhance penalty), preclude our resolution of the ambiguity against petitioner on the basis of general declarations of policy in the statute and legislative history. *See Crandon v. United States*, 494 U.S. 152, 160, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) ("Because con-

struction of a criminal statute must be guided by the need for fair warning, it is rare that legislative history or statutory policies will support a construction of a statute broader than that clearly warranted by the text").[99]

The Court's statement would appear to require application of the rule of lenity to the statutory construction issues here. The Tenth Circuit has quoted this passage from *Hughey* in a 1992 case involving the VWPA, *United States v. Diamond*,[100] and cited it in a 1993 case involving sentencing issues, *United States v. Wilson*.[101]

On closer examination, however, the rule of lenity issue becomes much more complex. The Tenth Circuit has squarely held that the statute at issue in this case—the MVRA—is not a punitive statute. In *United States v. Nichols*,[102] the Circuit faced the issue of whether to apply the MVRA (adopted in 1996) retroactively to crimes committed by Terry Nichols in 1995. The Circuit concluded that the Constitution's prohibition of ex post facto laws did not bar retroactive application of the new restitution statute because the statute was not punitive. The Circuit explained that the purpose of restitution " 'is not to punish defendants ... but rather to ensure that victims, to the greatest extent possible, are made whole for their losses.' "[103] The Circuit therefore concluded that the MVRA could apply to Nichols because it did not "inflict criminal punishment" upon him and thus was not punitive.[104]

---

**98.** 495 U.S. 411, 110 S.Ct. 1979, 109 L.Ed.2d 408 (1990).

**99.** *Id.* at 422.

**100.** 969 F.2d 961, 968 (10th Cir.1992).

**101.** 10 F.3d 734, 736 (10th Cir.1993), *cert. denied*, 511 U.S. 1057, 114 S.Ct. 1621, 128 L.Ed.2d 347 (1994).

**102.** 184 F.3d 1169 (10th Cir.1999).

**103.** *Id.* at 1279 (quoting *United States v. Arutunoff*, 1 F.3d 1112, 1121 (10th Cir.1993), *cert. denied*, 510 U.S. 1017, 114 S.Ct. 616, 126 L.Ed.2d 580 (1993)) (citing *United States v. Diamond*, 969 F.2d 961, 968 (10th Cir.1992), and *United States v. Rochester*, 898 F.2d 971, 983 (5th Cir.1990)).

**104.** *Id.* at 1279–80; *accord United States v. Bach*, 172 F.3d 520 (7th Cir.1999), *cert. de-*

██ Under the holding of *Nichols*, the rule of lenity would not apply to restitution statutes. The core concept behind of the rule of lenity is the same as the core idea behind the Ex Post Facto Clause: to protect criminal defendants from misuse of state criminal power. If the Ex Post Facto clause is inapplicable to restitution statutes because they do not inflict punishment, the rule of lenity is likewise inapplicable.

Given this seeming conflict between *Hughey* and *Nichols*, the court believes the Tenth Circuit's analysis in *Nichols* prevails for several reasons. To start with, *Hughey's* statement about the rule of lenity was dicta. *Hughey's* discussion of the lenity issue begins with the clause: *"Even were* the statutory language regarding the scope of a court's authority to order restitution ambiguous, longstanding principles of lenity...."[105] This clause signals that the ensuing discussion was not necessary to the holding, as the opinion had already squarely held that the statutory language was *not* ambiguous[106] and ambiguity is a necessary predicate to applying the rule of lenity.

Even though the discussion in *Hughey* is only dicta, the court is obviously reluctant to ignore guidance from the Supreme Court. Nonetheless, the Circuit's analysis in *Nichols* is more consistent with a full understanding of restitution and thus should be followed here. As the Supreme Court clarified in a decision decided after *Hughey*, "[t]he rule of lenity is premised on two ideas: First, a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed; second, legislatures and not courts should define criminal activity."[107] Of course, neither of those core concepts is implicated here: defendants Bedonie and Serawop had fair warning that involuntary and voluntary manslaughter were crimes before they acted. What is then left is a subsidiary component of the rule of lenity—"that the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended."[108] This policy is "rooted in the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should."[109] This policy concern, too, is irrelevant here. The issue in this case is not whether defendants Bedonie and Serawop will "languish" longer in prison; as the Tenth Circuit made clear in *Nichols*, restitution awards do not "inflict criminal punishment."[110] Instead, the issue here, as in *Nichols*, is whether victims of violent crimes are "to the greatest extent possible ... made whole for their losses."[111]

Indeed, if anything, there would seem to be more "instinctive distaste" for violent

nied, 528 U.S. 950, 120 S.Ct. 372, 145 L.Ed.2d 290 (1999).

**105.** *Hughey*, 495 U.S. at 422, 110 S.Ct. 1979 (emphasis added).

**106.** *Id.* at 419–20, 110 S.Ct. 1979.

**107.** *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 n. 18, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (internal quotations omitted).

**108.** *United States v. Diaz*, 989 F.2d 391, 393 (10th Cir.1993) (internal quotations and citations omitted).

**109.** *United States v. R.L.C.*, 503 U.S. 291, 305, 112 S.Ct. 1329, 117 L.Ed.2d 559 (1992) (internal quotation omitted).

**110.** *Nichols*, 169 F.3d at 1279 (quoting *United States v. Hampshire*, 95 F.3d 999, 1006 (10th Cir.1996), *cert. denied*, 519 U.S. 1084, 117 S.Ct. 753, 136 L.Ed.2d 690 (1997)).

**111.** *Id.* (internal quotations omitted).

criminals not making their victims whole than for parsimoniously interpreting restitution statutes. To the extent that any rule of construction applies in this case, it would appear to be the rule on remedial statutes: "When Congress uses broad generalized language in a remedial statute, and that language is not contravened by authoritative legislative history, a court should interpret the provision generously so as to effectuate the important congressional goals."[112] The Tenth Circuit appears to have implicitly taken this approach in construing at least some aspects of the MVRA. It has, for example, "liberally constru[ed]" procedural requirements in the MVRA to protect victims of crimes.[113] Similarly, other circuits appear to have taken approaches to construing the MVRA that implicitly deviate from the rule of lenity.[114]

For all these reasons, if the court needed a rule of statutory construction, it would not apply the rule of lenity and would construe the MVRA broadly as a remedial statute. But the court need not resort to rules of statutory construction where Congress' mandate is clear. "Lenity applies only when the equipoise of competing reasons cannot otherwise be resolved."[115] For the reasons reviewed above, the arguments here are not in equipoise. Rather, Congress has plainly mandated court to award future lost income in cases of violence, and the court will proceed to do so.

## III. Defendant Bedonie Should Pay Lost Income Restitution of $446,665 and Defendant Serawop Should Pay Lost Income Restitution of $325,751.

Having determined that lost income (including future income) is awardable as restitution, the next issue then becomes whether the record evidence regarding Mr. Johnson and Beyonce Serawop provide sufficient evidence to support such an award. Of course, the kind of evidence that is available on restitution issues will never be ironclad. As the Tenth Circuit has reminded trial courts, " '[t]he determination of an appropriate restitution is by nature an inexact science.' "[116] This comment is particularly apt when the issue is future lost income, as some assumptions about future conditions have to be made. But the uncertainties inherent in making projections provide no reason for declining to making a restitution award. How to compensate victims of wrongdoing when the evidence is uncertain is a problem that judges and juries regularly confront. The Supreme Court has helpfully summarized the relevant principles in a seminal case concerning antitrust damages:

[E]ven where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage

112. *California v. American Stores Co.,* 495 U.S. 271, 279 n. 4, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990).

113. *See Reano,* 298 F.3d at 1212 (quoting *United States v. Dando,* 287 F.3d 1007, 1010 (10th Cir.2002)).

114. *See, e.g., United States v. Zakhary,* 357 F.3d 186 (2nd Cir.2004) (collecting authorities construing provision in the MVRA to "protect crime victims" rather than defendants); *United States v. House,* 808 F.2d 508,

511 (7th Cir.1986) (holding unequivocally that provision in the MVRA ought be construed in a fashion that "protects the victim, not the offender") (agreeing with *United States v. Keith,* 754 F.2d 1388, 1393 (9th Cir.1985)).

115. *Johnson v. United States,* 529 U.S. 694, 713, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000).

116. *United States v. Williams,* 292 F.3d 681, 688 (10th Cir.2002) (quoting *United States v. Teehee,* 893 F.2d 271, 274 (10th Cir.1990)).

based on relevant data, and render its verdict accordingly. In such circumstances juries are allowed to act on probable and inferential as well as [upon] direct and positive proof. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.[117] The Court went on to explain that "the most elementary conceptions of justice and public policy" demand that "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."[118] Reviewing civil cases from a variety of areas, the Court concluded that "[t]he constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery for a proven invasion of the plaintiff's rights."[119]

If an economic tortfeasor may not profit from his own wrong, the same principle applies, *a fortiori*, to a murderer or other violent criminal. Indeed, violent criminals have far less right to complain about uncertainties left in the wake of their terrible crimes. In civil tort cases, courts routinely award lost income to those with uncertain income streams (including very young children).[120] The courts should not shrink from the duty to give the same protection to victims of criminal violence.

Proceeding on this basis, the court concludes that Mr. Johnson and Beyonce Serawop lost income when they were killed by the defendants and that the amounts of that loss can be reasonably calculated.

### A. Expert Testimony on the Amount of Lost Income

To assist the court in estimating income that the victims lost, the court appointed a leading expert—Dr. Paul Randle—to evaluate the subject. The basis for the court's authority to appoint an expert on this subject was reviewed in a previous opinion in this case.[121] Dr. Randle provided several reports to the court containing lost income calculations for Mr. Johnson and Beyonce Serawop. He testified at length at the restitution hearing on March 25, 2004, and was questioned by the court and counsel for all parties. The court concludes that Dr. Randle's testimony provides a reasonable basis to project the income lost by Mr. Johnson and Beyonce Serawop.

#### 1. Dr. Randle's Expect Testimony is Admissible.

The court first finds that Dr. Randle is a well qualified expert in the area of lost income calculations. Among other degrees, he has a Ph.D. in Corporate Finance from the University of Illinois at Champaign–Urbana. He was a finance professor at Utah State University in Logan, Utah, for more than thirty years and has performed literally thousands of lost income calculations. He has testified in court more than a hundred times on lost

---

117. *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946) (internal citations omitted); *accord E. J. Delaney Corp. v. Bonne Bell, Inc.,* 525 F.2d 296, 303 (10th Cir.1975), *cert. denied,* 425 U.S. 907, 96 S.Ct. 1501, 47 L.Ed.2d 758 (1976).

118. *Bigelow,* 327 U.S. at 265, 66 S.Ct. 574.

119. *Id.* at 265–66, 66 S.Ct. 574

120. *See, e.g.,* note 80.

121. *See United States v. Serawop,* 303 F.Supp.2d 1259 (D.Utah 2004).

income issues. He has developed computer programs for calculating economic losses and has received many honors. He is, in short, one of the leading experts on lost income in Utah, and possibly the country. Interestingly, this is the first criminal case in which he has been asked to calculate lost income damages.

■ The court further finds that Dr. Randle's expert testimony satisfies the admissibility requirements set by Rule 702 of the Federal Rules of Evidence. While the rules of evidence do not formally apply at sentencing,[122] out of an abundance of caution the court has considered whether his testimony satisfies the Rule's requirements. The Tenth Circuit has explained that Rule 702 requires the court to consider whether: (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[123] Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*[124] this court should determine the reliability of scientific evidence by considering such factors as whether the technique employed can be tested and whether it has gained general acceptance in the relevant scientific community. The *Daubert* factors are not a "checklist" or "test" and the overarching question is "reliability." The Supreme Court's latter decision in *Kumbo Tire* dictates that these factors also apply to "specialized" knowledge, such as the subjects covered in Dr. Randle's testimony.

It is within this framework that the court finds, considering all of the relevant factors, that Dr. Randle's testimony is based on sufficient facts, is the product of reliable methods, and has been reliably applied to the facts of this case. None of the parties appear to have seriously argued otherwise, and Dr. Randle's testimony is the type that is routinely admitted in civil cases where lost income issues arise.[125]

*2. Lost Income Projections for Mr. Johnson.*

Turning first to Mr. Johnson, Dr. Randle made several different income projections. His first scenario assumed that Mr. Johnson would have been employed at his level of education (high school) at age 21 and for the balance of his expected work-life (about 37 years). Dr. Randle further assumed that Mr. Johnson would have earned 58% of the average earnings of a high school graduate in the United States—58% being the average ratio of wages for male Native Americans to wages for white males. Dr. Randle further assumed that Mr. Johnson's wages would have grown at the average rate of wage growth for all U.S. workers over the past 25 years (4.28%). He then reported the wage loss projections in constant 2002 dollars and discounted to present value using a 25–year average return on government treasury bills. This methodology produced a present value of Mr. Johnson's probable wage loss of $433,562, which Dr. Randle viewed as the lower bound for lost income.[126]

---

122. *See* Fed.R.Evid. 1101(d)(3).

123. *Lantec, Inc. v. Novell, Inc.,* 306 F.3d 1003, 1025 (10th Cir.2002).

124. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

125. *See, e.g., Blevins v. Cessna Aircraft, Co.,* 728 F.2d 1576, 1580 n. 3 (10th Cir.1984)

(noting plaintiff's economic expert testified as to "plaintiff's lost earnings to date, potential loss of earning capacity to age 70, lost fringe benefits, and potential loss of retirement income, reduced to present value").

126. Report of Dr. Randle at 4, Feb. 25, 2004 (entered as an exhibit during Mar. 25, 2004, hearing).

Dr. Randle's second scenario used all of the same assumptions except that Mr. Johnson would have achieved one or more years of post-secondary education (as he had planned) and then entered the workforce at age 23. This produced a present value of probable wage loss of $495,598.

When the court received Dr. Randle's report, it was concerned about possible constitutional and other problems in relying on race and sex assumptions. So that all possible options would be available for discussion, the court directed Dr. Randle to recalculate lost income without regard to race or sex. Dr. Randle then produced a new report using normal wages for all American workers as the basis for projecting Mr. Johnson's lost income. This produced a lost income calculation of $744,442 (assuming only high school education) or $850,959 (assuming one or more years of post-secondary education).[127]

The court later asked for one last calculation from Dr. Randle. The court received the letter from Mr. Johnson's high school art teacher reporting he earned about $1500 per year from art sales during high school. The court then asked Dr. Randle to assume Mr. Johnson was no more successful than he had been in high school and to use the $1500 figure to project lost income of his expected working lifetime. On that highly conservative assumption, Dr. Randle projected lost income of $40,907.[128]

Based on the testimony of Dr. Randle, the court finds that the range of lost income for Mr. Johnson is between $40,907 and $850,959.

### 3. Lost Income Projections for Beyonce Serawop.

To project lost income for Beyonce Serawop, Dr. Randle proceeded in a similar fashion. He first assumed that she would have been employed with less than a high school education, beginning at age 17, for the balance of her worklife. He also assumed that Beyonce would have earned an annual wage (in current dollars) equal to 76% of the average earnings for white females (76% is the ratio of wages of female Native Americans compared to those of white females). Calculating normal wage growth and discounting to present value, he concluded that the value of Beyonce's lost wages was $171,366.

Dr. Randle's second scenario used the same assumptions, except that he assumed Beyonce would have achieved a high school education and entered the labor force at age 18. This scenario produced a value of lost wages of $251,148.

Dr. Randle's third scenario used the same assumptions, except that he assumed Beyonce would have obtained some post-secondary education and entered the labor force at age 21. This scenario produced a value of lost wages of $273,000.

On receipt of this report, the court was again concerned about the permissibility of race and sex adjustments. Accordingly, the court asked Dr. Randle for additional calculations that were race- and sex-neutral. Dr. Randle then produced a new report, using wage figures for all Americans. Since no sex-neutral worklife estimates were available, Dr. Randle simply used the figures available for males, which are longer than those for females. This methodology produced lost wage estimates of $308,633 (employed with less than a

---

127. Report of Dr. Randle at 1, Feb. 28, 2004 (entered as an exhibit during Mar. 25, 2004, hearing).

128. Report of Dr. Randle at 1, Mar. 23, 2004 (entered as an exhibit during Mar. 25, 2004 hearing).

high school education), \$511,623 (high school education), and \$576,106 (some post-secondary education).

At the restitution hearing at which Dr. Randle testified, an additional method for estimating Beyonce Serawop's lost income was suggested. The court learned that, as a soon-to-be enrolled member of the (Northern) Ute Indian Tribe, Beyonce Serawop would have been entitled to a stipend of approximately \$100 per month. This stipend is derived from revenues received by the Tribe for leasing tribal lands for oil and mineral development and has fluctuated in recent years from around \$80 to \$100. Dr. Randle calculated that the present value of these payments to Beyonce was between \$17,118 (assuming an \$80 a month stipend) and \$21,397 (assuming a \$100 a month stipend).

Based on the testimony of Dr. Randle, the court finds that the range of lost income for Beyonce Serawop is \$17,118 to \$576,106.

## B. Race and Sex Adjustments.

The next issue that arises is whether the court should use race- and sex-neutral statistics to calculate the lost income of the victims. Recent legal commentary have raised substantial questions about use of race and sex adjustments.[129] Yet surprisingly the reported cases have almost completely neglected the question. A possible explanation for this dearth of case law is provided by Professor Chamallas, who perceptively notes that "[t]he economists who testify as expert witnesses and the lawyers who try personal injury cases are unlikely to be primed to identify race and gender inequities in a context totally removed from a civil rights case."[130] In this case, Dr. Randle, who has performed thousands of lost income analyses, testified that no one had ever asked him to provide race- and sex-neutral calculations in wrongful death cases, although he has used sex-neutral calculations in pension cases.[131]

The basic issue is clearly framed by the lost income calculations in this case. Using race and sex adjustments to calculate lost income significantly reduces the awards that the victims would otherwise receive. Dr. Randle explained that Native–American males earn, on average, 58% of wages of white males.[132] Making the adjustment suggested by this statistic, Dr. Randle calculated lost income for Mr. Johnson as follows:

129. See Laura Greenberg, Compensating the Lead Poisoned Child: Proposals for Mitigating Discriminatory Damage Awards, 28 B.C. ENVTL.AFF.L.REV. 429 (Winter, 2001); Martha Chamallas, The Architecture of Bias: Deep Structures in Tort Law, 146 U. PA. L.REV. 463 (January 1998); Sherri R. Lamb, Toward Gender–Neutral Data for Adjudicating Lost Future Earning Damages: An Evidentiary Perspective, 72 CHI.-KENT L.REV. 299 (1996); see also Elaine Gibson, The Gendered Wage Dilemma in Personal Injury Damages, in TORT THEORY 185, 198 (Ken Cooper–Stephenson & Elaine Gibson eds., 1993); Jamie Cassels, Damages for Lost Earning Capacity; Women and Children Last, 71 CAN.B.REV. 447, 448 (1992); Ken Cooper–Stephenson, Damages for Loss of Working Capacity for Women, 43 SASK.L.REV. 7 (1978–79);

130. Martha Chamallas, Questioning the Use of Race–Specific and Gender–Specific Economic Data in Tort Litigation: A Constitutional Argument, 63 FORDHAM L.REV. 73, 76 (1994).

131. Restitution Hr'g. Mar. 25, 2004, Tr. at 36.

132. Report of Dr. Randle in United States v. Johnson, Feb. 25, 2004, at 2 (citing Unequal Treatment on the Job, American Indian Policy Center, www.airpi.org/research/unequal.html).

### Table I—Brian Johnson Lost Income

| | High School | Some Post–Secondary |
|---|---|---|
| No Adjustment | $744,442 | $850, 959 |
| Race–Adjusted | $433,562 | $495,598 [133] |

Similarly, for Beyonce Serawop, Dr. Randle essentially reduced Beyonce's earnings by, first, using lower earnings figures for females and then decreasing the calculation further to reflect the fact that Native-American females earn, on average, 77% of white females.[134] Taken together, these adjustments produced the following figures.

### Table II—Beyonce Serawop Lost Income

| | Non H.S. Graduate | H.S. Graduate | Post–Secondary |
|---|---|---|---|
| No Adjustment | $308,633 | $511,623 | $576,106 |
| Race/Sex–Adjusted | $171,366 | $251,148 | $273,000 [135] |

At first blush, including race and sex adjustments appears consistent with the approach encouraged by some treatises, which suggest use of race and sex based statistics for calculating lost income when a claimant has no established earnings record.[136] Some commentators have also uncritically accepted race- and sex-based reductions in earnings calculation without careful consideration of their appropriateness.[137]

In this case, both the government and the defendants argue that race- and sex-based adjustments are proper. The government's pleading on this issue asserts that

the economic data relied upon in Dr. Randle's first report accurately reflects economic reality and the role that race and gender play in earnings today. As much as we wish that the average earning potential of all groups could be equal, the data relied upon by economists in calculating lost earnings show that, on average, white earn more than Native Americans and men have a longer expected work life than women. These are relevant facts in determining the victims' actual losses.[138]

The defendants take a similar position. For example, defense counsel for Ms. Bedonie argues that the court should consid-

---

133. *Compare* Report of Dr. Randle in *United States v. Johnson*, Feb. 28, 2004, at 1 (race-neutral calculations) with Report of Dr. Randle in *United States v. Johnson*, Feb. 25, 2004, at 2–3 (use of Native–American discount).

134. Report of Dr. Randle in *United States v. Serawop*, Feb. 25, 2004, at 2 (citing *Unequal Treatment on the Job*, American Indian Policy Center, *www.airpi.org/research/unequal.html*).

135. *Compare* Report of Dr. Randle in *United States v. Serawop*, Feb. 28, 2004, at 1 (race- and sex-neutral calculations) with Report of Dr. Randle in *United States v. Serawop*, Feb.

25, 2004, at 2–3 (use of female and Native–American discounts).

136. *See, e.g.*, Paul M. Deutsch & Fredrick A. Raffa, 8 DAMAGES IN TORT ACTIONS, 110.11(2), at 110–8 (Matthew Bender 1994).

137. *See, e.g.*, Douglas M. Foley, Note, *Infants, Lost Earning Capacity, and Statistics: Sound Methodology or Smoke and Mirrors?*, 13 GEO. MASON U.L.REV. 827, 829 (1991).

138. Government's Position on Calculation of Future Lost Income Restitution at 8, *United States v. Serawop* (Apr. 12, 2004) (Dkt. No. 89–1).

er the fact that 43% of the Navajo population lives below the poverty level and that the unemployment rate is 43%.[139] She also urges the court to consider the asserted fact that the Navajo population has an adjusted death rate from alcoholism eight times higher than the national average.[140]

The case law on the subject of such adjustments is limited.[141] Some courts have simply accepted them without raising any concerns.[142] For example, some standard jury instructions ask the jury to consider, among other factors, the age, physical, mental characteristics, and *sex* of the child in determining a lost income award in a wrongful death case.[143]

In recent years, a few courts have carefully reviewed the question and have questioned the use of such adjustments. The leading case on this subject—*Reilly v. United States of America*[144]—questioned the use of a reduced worklife table to calculate the lost income for a young woman who had suffered severe brain damage

due to malpractice when she was born. The District Court for the District of Rhode Island concluded:

> I cannot accept Dr. Mooney's reduction of Heather's estimated working life by 40%. The reduction relies solely on a survey of women's work histories between 1978 and 1980. As a factual matter, I seriously doubt the probative value of such a statistic with respect to twenty-first century women's employment patterns, particularly in light of current, ongoing changes in women's labor force participation rates. As a matter of law, moreover, I know of no case authority and none has been cited to me supporting Dr. Mooney's 40% reduction. On the contrary, both federal and state authorities within the jurisdiction counsel against such disparate treatment.[145]

Upon review, the First Circuit upheld the district court, concluding that such reductions in awards were "sexist" and "antiquidated." [146]

---

**139.** Def.'s Reply Mem. Regarding Future Lost Income at 11 (citing statistics), *United States v. Bedonie* (Apr. 14, 2004) (Dkt. No. 53–1).

**140.** *Id.*

**141.** *See generally* Chamallas, *supra*, 63 Fordham L.Rev. at 97–99 (helpfully summarizing the cases).

**142.** *See Frankel v. United States*, 321 F.Supp. 1331, 1337–8 (E.D.Pa.1970) (reducing lost income award on the assumption female plaintiff would marry, bear children, and leave interrupt her career); *aff'd sub nom Frankel v. Heym*, 466 F.2d 1226 (3rd Cir.1972); *Gilborges v. Wallace*, 153 N.J.Super. 121, 379 A.2d 269 (1977) (implicitly endorsing sex-based tables); *Morrison v. State*, 516 P.2d 402 (Alaska 1973) (endorsing data for white Alaskan females); *Johnson v. Misericordia Community Hospital*, 97 Wis.2d 521, 294 N.W.2d 501, 527 (App.1980) (affirming race-based statistics for lost income calculation); *Powell v. Parker*, 62 N.C.App. 465, 303 S.E.2d 225, 228 (1983) (affirming race-based statistics for lost income calculation).

**143.** *See, e.g., Eakelbary,* Summit App. No. 9476 (Ohio Ct.App.1980) (sex-based instruction)(*citing Immel v. Richards*, 154 Ohio St. 52, 93 N.E.2d 474, 475 (1950) (listing "sex" as a factor)); *see also Franchell*, 73 A.D.2d 1, 424 N.Y.S.2d 959, 962 (1980) (listing "sex" as a factor); *King v. Louisville & Nashville R. Co.*, No. 87–199–II, 1987 WL 26384 (Tenn.Ct. App. Dec.9, 1987) (citing *Crowe v. Provost*, 52 Tenn.App. 397, 374 S.W.2d 645 (1963) (listing "sex" as a factor)).

**144.** *Reilly v. United States*, 665 F.Supp. 976 (D.R.I.1987), *aff'd*, 863 F.2d 149 (1st Cir. 1988).

**145.** 665 F.Supp. at 997 (citing *Caron v. United States*, 548 F.2d 366, 371 (1st Cir.1976) (In awarding damages for lost earnings, "we see no reason to distinguish between the sexes...."); *Taft v. Cerwonka*, 433 A.2d 215, 219–20 (R.I.1981) (affirming trial court's unreduced award of 41.2 years' lost earnings on behalf of female decedent)).

**146.** 863 F.2d at 167.

Similarly, in *Wheeler Tarpeh–Doe v. United States*,[147] the District Court for the District of Columbia was asked to determine whether the appropriate measure of lost income damages for a bi-racial child was the average earnings of African–American males or white males. The court refused to determine which statistic should predominate; instead, the court concluded that damages should be measured by the average earning of all college graduates in the United States without regard to sex or race.[148] The court's stated goal was to "eliminate any discriminatory factors" from the recovery awarded to the plaintiff.[149]

Along the same lines, in *Childers v. Secretary of Health and Human Services*,[150] the United States Court of Claims, Office of the Special Masters, determined that a worklife expectancy should not be adjusted downward for a female claimant. The court explained its rationale:

> Does it follow that because some women have historically been able to spend years out of the workforce, female children in the Program should always get substantially smaller awards for "lost earnings" than male children? I do not think so. Rather, I note that nowhere in the statutory formula ... is there any express, or even implied, distinction between males and females. Indeed, the formula *mandates*, as discussed above, that the basic earnings figure be determined by averaging the earnings of *all* workers, even though historically female workers have earned somewhat less than male workers. Therefore, just as we do not under the formula use different *average earnings* figures for males and females, I see no good reason to use different work-life expectancy figures based upon gender.[151]

Further suggestion of problems in using such adjustments comes from the Supreme Court's decision in *Arizona Governing Committee for Tax Deferred Annuity and Deferred Compensation Plans, et al., v. Norris*.[152] The Court held that an employee benefit program that paid out lower retirement benefits to women because they lived longer violated Title VII.[153] Relying on its prior holding in *City of Los Angeles Dept. of Water & Power v. Manhart*,[154] the Court noted that actuarial studies could "unquestionably" identify real-world differences in life expectancy based on race, national origin, or sex.[155] Nonetheless, the Court held that such studies could not be used as a justification for paying employees of one sex less than another.[156] The Court concluded that even though the actuarial generalizations about women as a class might be true, they could not justify class-based treatment.[157] Both *Norris* and *Manhart* involved Title VII, and the Court concluded that Congress clearly intended to prohibit classifications based on race or sex.[158] These cases highlight both Con-

---

147. 771 F.Supp. 427, 455 (D.D.C.1991), *rev'd on other grounds Tarpeh–Doe v. United States*, 28 F.3d 120 (D.C.Cir.1994).

148. *Id.* at 456.

149. *Id.*

150. 1999 WL 218893 (Mar. 26, 1999).

151. *Id.* (emphasis in original).

152. 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983).

153. *Id.* at 1081–1082, 103 S.Ct. 3492.

154. 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978).

155. *Norris*, 463 U.S. at 1083, 103 S.Ct. 3492 (citing *Manhart*, 435 U.S. at 709, 98 S.Ct. 1370).

156. *Id.*

157. *Id.* at 1084, 103 S.Ct. 3492 (internal citations omitted).

158. *Id.*

gress' and the Court's concerns with equal protection issues when using class-based assumptions. These cases may also explain why, as noted earlier, Dr. Randle has been asked to use sex-neutral calculations in determining pension annuities.

 Reasoning from these cases, some commentators have suggested that use of race and sex in economic calculations is positively unconstitutional. Perhaps the most thorough exposition of the argument comes from Professor Chamallas, who contends that the constitutional guarantee of equal protection prohibits state action differentiating on race or sex, including lost income calculations.[159] This constitutional argument is worth serious attention. Nonetheless, it is novel. A time honored-principle of constitutional adjudication requires "that court avoid reaching constitutional questions in advance of the necessity of deciding them." [160] Here, there is a narrower ground for rejecting race and sex distinctions. In framing restitution awards, the court certainly operates within a zone of discretion, because the process is not an "exact science." [161] As a matter of fairness, the court should exercise its discretion in favor of victims of violent crime and against the possible perpetuation of inappropriate stereotypes. This is particularly true in this case, where the defendants have deprived their victims of the chance to excel in life beyond predicted statistical averages. In fairness to the victims, therefore, the court should not use race- and sex-neutral data in calculating losses. Moreover, defendants should shoulder the burden of proving that any

reduction based on race or sex is appropriate. Here, the court concludes as a factual matter that the defendants have simply failed to prove that a stereotypical discount is satisfied. Their evidence is too speculative and insufficiently connected income losses of the particular victims in these cases.

One last issue needs to be considered. Both the government and the defendants argue that the court can avoid the need for making overt racial distinctions in this case by relying instead on "geography." Thus, defense counsel in the *Bedonie* case has provided to the court income statistics for Apache County, Arizona, near where Mr. Johnson lived.[162] These statistics purport to show substantially lower income in Apache County than the national average.

 The court does not believe that a geographical reduction in the award should be made. It is apparent that here the purported geographical information would serve as nothing other than a proxy for racial distinctions. It appears that the overlap between the classifications of persons who live in Apache County and Native Americans is very high. In various contexts, the courts have clearly held that the prohibitions against racial discrimination cannot be skirted by the simple expedient of discriminating on the basis of geography. More than thirty years ago, school desegregation cases barred geographically-based school assignments when the end result was effectively racial classifications.[163] More recently, the Ninth Circuit has held that peremptory challenges

---

**159.** See Chamallas, *supra,* 63 Fordham L.Rev. at 104.

**160.** *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988).

**161.** *United States v. Williams,* 292 F.3d 681, 688 (10th Cir.2002).

**162.** Def.'s Reply Mem. Regarding Future Lost Income at 11 (citing statistics), *United States v. Bedonie* (Apr. 14, 2004) (Dkt. No. 53–1).

**163.** *See, e.g., United States v. Jefferson County Board of Education,* 372 F.2d 836, 870 fn. 71 (5th Cir.1966), citing *Bush v. Orleans Parish School Board,* 308 F.2d 491, 499 (5th Cir. 1962).

purported exercised on the basis of where prospective jurors live may be little more than a cover for challenges actually based on race.[164] As the Ninth Circuit has explained, "Residence, as it were, often acts as an ethnic badge." [165] In light of these principles, it appears to the court that the parties in this matter want to have geography serve as nothing other than a substitute for racial distinctions. For that reason alone, the court declines to make any "geographical" reductions.

Dr. Randle also provided a separate and independent reason for declining to make geographical adjustments to income assessments. He never makes such an adjustment because, as he cogently explained: "There are no brick walls built around Cortez, Colorado, or Farmington, New Mexico. People ... can still live anywhere they want to in the United States, and had [Mr. Johnson] been successful in doing what it's indicated he might have done, then he may well have been living in Phoenix making $150,000 a year." [166] The court agrees with Dr. Randle that the mobility of workers in the American economy is an additional reason for declining to make a geographical adjustment.

### C. Calculating the Lost Income Awards.

#### 1. The Lost Income of Mr. Johnson.

In light of the foregoing principles and expert testimony, the court will now make specific findings regarding the lost income of Mr. Johnson. Initially, the court concludes that Mr. Johnson would have earned considerable income if he had not been killed by defendant Bedonie. While he was not an exceptional student, he was already showing promise as a talented artist during high school. According to a detailed letter from Superintendent Karen Lesher, his Graphics Arts teacher, Mr. Johnson was "an exceptionally talented student and was recognized by the school community as a resource for art designs for school and community posters, mural, programs, t-shirts, and a variety of publications." [167] Mr. Johnson entered three of his art projects each year in the Heard Museum High School Art Show in Phoenix, Arizona. He usually sold all of his projects for more than $100 a piece. Mr. Johnson also sold art at the annual Red Mesa Art show and would frequently take orders for art work (including portraits and specific subjects) from those in the school community.

During high school, Mr. Johnson was earning approximately $1200 to $1500 annually.[168] As Dr. Randle calculated, assuming that Mr. Johnson would have done nothing more than continued to earn $1500 annually for the rest of his life by selling art work on the side, the present value of his lost earnings would have been no less $40,907.[169] This is a highly conservative figure.[170] It is virtually certain that Mr. Johnson would have earned more than this during his lifetime.

---

**164.** *United States v. Bishop*, 959 F.2d 820, 826 (9th Cir.1992).

**165.** *Id.* at 828.

**166.** Restitution Hr'g, Mar. 25, 2004, Tr. at 55.

**167.** Letter from Superintendent Karen C. Lesher to Whom It May Concern (Mar. 10, 2004) (entered as an exhibit pursuant to May 6, 2004 order).

**168.** *Id.*

**169.** Report of Dr. Randle in *United States v. Bedonie*, Mar. 23, 2004, at 1.

**170.** *See* Restitution Hr'g, Mar. 25, 2004, Tr. at 88, 2–10.

The court concludes that Mr. Johnson would have succeeded in his aspirations to attend art school and become a professional artist. His teachers believed that he had the talent to succeed. His mother presented several portraits sketched by Mr. Johnson during her sentencing allocution that were quite impressive.[171] He planned to pursue further education as an artist and had received applications some time earlier from several art institutes. He had mailed an application to the Institute of American Indian Arts in 2000, which was returned to him for additional information. He had several scholarships to attend arts programs and hoped to attend art school, marry, and raise a family.

Perhaps because his aspirations were in art, Mr. Johnson's employment record in other jobs was sporadic. After graduating from high school in 2001, he worked occasionally at a lumber yard in Cortez, Colorado, earning $7 to $8 an hour, as well as at the Ute Mountain Casino in that city. Apparently he was fired from both jobs.[172] He was seeking work at the time of his death and had thought about working at Checker Auto.[173] Contrary to tentative suggestions made in a pleading filed by defense counsel,[174] Mr. Johnson had no prior criminal record and no significant long-term health problems.[175]

In light of all this evidence, a conservative calculation of the future lost income is $744,442. This figure is the lowest race-neutral figure reported by Dr. Randle. Apart from the arguments rejected in previous sections, neither side has challenged the reasonableness of this figure as a race-neutral figure for future lost income.

Dr. Randle's figure, however, assumes that Mr. Johnson would have been employed constantly. The evidence in the record shows that Mr. Johnson's actual employment history was irregular. Moreover, Mr. Johnson's chosen field of interest—art—is notorious for irregular hours and work. Accordingly, the court concludes reducing the award by a percentage amount is appropriate to reflect these facts. Dr. Randle testified that percentage reductions are reasonable estimation devices.[176] There is, of course, no specific evidence as to the exact percentage discount that might be appropriate. Nor have the parties offered any specific suggestion on these particular points. The court therefore must make a reasonable estimate. The court finds that the evidence suggests that Mr. Johnson would have been employed 60% of the time and thus Dr. Randle's lost income figure should be discounted by 40%. This produces a lost income figure of $446,665. This figure seems conservative because it assumes that Mr. Johnson would not have obtained any further education, an assumption that the court has already rejected.

In sum, the court concludes that $446,665 is a reasonable and conservative calculation of Mr. Johnson's lost income.

---

171. *See* Transcript of Sentencing, *United States v. Bedonie,* Jan. 21, 2004.

172. *See* Def. Bedonie's Reply Mem. Regarding Future Lost Income at 8, *United States v. Bedonie* (Apr. 14, 2004) (Dkt. No. 53–1).

173. Joint Stipulation—Testimony of Cecilia Johnson, *United States v. Bedonie* at 2 (Apr. 13, 2004) (Dkt. No. 51–1).

174. *See* Defendant Bedonie's Motion Requesting That Cecilia Johnson Be Deposed Pursuant to Rule 15(a)(1) at 3–4, *United States v. Bedonie* (Mar. 9, 2004) (Dkt. No. 37–1).

175. Joint Stipulation—Testimony of Cecilia Johnson, *United States v. Bedonie* at 3–4 (Apr. 13, 2004) (Dkt. No. 51–1).

176. Restitution Hr'g, Mar. 25, 2004, Tr. at 27–28.

### 2. The Lost Income of Beyonce Serawop.

The facts regarding Beyonce Serawop's lost income are much more limited. This is not surprising, since when defendant Serawop killed the three-month-old baby, he deprived her of the chance to grow and succeed in life. Nonetheless, the court can make some findings that are relevant.

The court finds that Beyonce was a generally healthy and happy baby when defendant Serawop killed her. Beyonce resided on the Uintah–Ouray ("Ute") Reservation. Beyonce's mother, who had some difficulties of her own, loved her daughter very much. Beyonce's autopsy also revealed no major health problems.

Defendant Serawop has also argued that one factor relevant to Beyonce's lost income determination was the fact that she resided in a household where *he* was abusive. He argues, for instance, that because of his history of domestic violence, Beyonce was less likely to graduate from high or, more generally, to be successful in life.[177] The court gives no weight to this argument. Defendant Serawop is hardly entitled to creative an abusive family situation and then argue that, because of this abuse, his daughter was less likely to succeed in a life.

Calculation of Beyonce's lost income can begin with the "floor" set by the stipend she received from her Tribe. As Dr. Randle calculated, the present value of these payments would not have been less than $17,118. Her lost income would have been at least this amount.

■ The court, however, believes that the limited evidence supports the conclusion that Beyonce would have at least gone on to achieve additional earnings along the lines of Dr. Randle's most conservative race- and sex-neutral calculation of

$308,633. This figure assumes that she would have been employed with less than a high school education, beginning at age 17, for the balance of her worklife. Apart from the arguments discussed above, neither side has challenged the reasonableness of this figure as a race and sex-neutral figure for future lost income. This is a conservative figure, as it assumes that Beyonce would not have finished high school; of course, she never had the chance to attend high school because of the crime committed by her father. The court, accordingly, finds that a conservative lost income calculation is $308,633, supplemented with the $17,118 stipend she would have received from her Tribe, for total lost income of $325,751.

### D. No Need to Offset for Consumption.

The government and defendants Bedonie and Serawop challenge awarding the victims lost income without deducting for consumption. In the parties' view, awarding lost income produces a "windfall" by allowing recovery for income that never would have gone to the victims' estates; instead, it would have been consumed by the victims had they lived. The parties thus urge the court to deduct the victim's expected consumption from their projected income in calculating restitution.

■ While this argument may have some merit in other civil contexts, it is not persuasive in awarding criminal restitution under the MVRA. Modern courts have recognized two primary methods to calculate future lost income. The first measure is what Dr. Randle has called lost "earning capacity" or "gross income." This measure is simply the projected amount an individual would have earned had he lived to his normal life expectancy. The second measure is called "net income," which

---

**177.** Def.'s Objections to Expert's Submission, *U.S. v. Serawop*, at 2 (Apr. 29, 2004) (Dkt. No. 98–1); *see also* Restitution Hearing, Mar. 25, 2004, Tr. at 41.

courts have defined as "gross income" minus "personal maintenance expenses" or "consumption." [178] In civil cases, courts have used both measures, usually depending on whether the injured person survives an injury. Where an injured person survives the injury, the measure of lost future earnings is generally gross income.[179] Where an injured person dies from the injury, however, the usual measure of lost future earnings is net income—that is, gross income less consumption.[180] The rationale for this distinction is that "a decedent, unlike an injured person, has no future maintenance costs, and that, therefore, to fail to deduct such costs from his estimated cross future earnings would result in a windfall to his estate." [181]

At the request of the parties, the court asked Dr. Randle to generate some figures that would offset lost income awards by a consumption amount. As he indicated at the hearing, determining a proper consumption offset is quite difficult.[182] For example, if a person is assumed to stay single his entire life, the proportion of income devoted to his consumption may be high. On the other hand, if a person is assumed to marry and have children, the proportion of income given to other purposes (e.g., to support a spouse and children) increases considerably.

Dr. Randle was able to make some typical assumptions and run calculations with an offset for consumption. In Mr. Johnson's case, Dr. Randle considered two scenarios: first, Mr. Johnson never married; and, second, that Mr. Johnson married at age 23, had a child at age 25, and another child at age 28. Applying the first scenario to the race-neutral high school graduate lost income calculation reduced the $744,442 lost income figure by $612,602 for consumption, leaving a prevent value of lost income net of consumption of $131,840.[183] Applying the second, married-with-children scenario to the same figure produced a consumption offset of $183,404, leaving a prevent value of lost income net of consumption of $561,038.[184]

In Beyonce Serawop's case, Dr. Randle considered the two same scenarios: first, never married; and, second, married at age 23 with two children at ages 25 and 28. Applying the first scenario to the most conservative of the race- and sex-neutral calculations (no high school graduation) re-

---

178. *See Wallace v. Couch*, 642 S.W.2d 141, 143 (Tenn.1982) (quoting 76 A.L.R.3d 125, 131 (1977)).

179. *See generally,* James O. Pearson, Annotation, *Recovery, in Action for Benefit of Decedent's Estate in Jurisdiction Which Has Both Wrongful Death and Survival Statutes, of Value of Earnings Decedent Would Have Made After Death,* 76 A.L.R.3d 125, 132, 1977 WL 45705 (1977) (collecting authorities).

180. *See, e.g., Reilly v. United States,* 665 F.Supp. 976, 988 (1987) (holding measure of damages in wrongful death action was "lost future earnings of the decedent" minus "the decedent's estimated living expenses"); *Roberts v. Dungan,* 133 Pa.Cmwlth. 98, 574 A.2d 1193, 1196 (1989) (holding damages in a survival action for the death of a minor daughter "include a decedent's loss of earning capacity or potential, less personal maintenance, from

the time of death through the decedent's estimated lifetime employment period"); *Wagner v. Flightcraft, Inc.,* 31 Wash.App. 558, 643 P.2d 906, 912 (1982) (holding correct measure of damages in survival action for unmarried decedent with no dependents was "future net earnings," which included "the present value of decedent's probable future accumulations" minus "all probable expenditures of the decedent").

181. Pearson, *supra,* 76 A.L.R.3d 125, 132, 1977 WL 45705.

182. Restitution Hr'g, Mar. 25, 2004, Tr. at 46–48.

183. Report of Dr. Randle in *United States v. Bedonie,* Apr. 22, 2004, at 5 (tbl.6).

184. *Id.*

duced the $308,633 lost income figure by $253,974 for consumption, leaving a prevent value of lost income net of consumption of $54,659.[185] Applying the second, married-with-children scenario to the same figure produce a consumption offset of $101,258, leaving a prevent value of lost income net of consumption of $207,375.

As is apparent from the wide range generated by these numbers, the assumptions one makes about the future of a victim (e.g., married? had children?) can make vast differences in the calculations. The burden of proof would be on the party urging a consumption reduction to prove it was justified, and the court finds that such proof has not been made here; the assumptions are simply too speculative.

 Even if such proof had been made, however, the MVRA does not permit a consumption reduction. While an offset for consumption may make sense in some civil contexts, its application in the criminal context depends on the terms of the criminal restitution statute at issue. Federal courts have no inherent power to award restitution in a criminal case, so their authority to do so is controlled exclusively by the language of the authorizing statute.[186] While at least one state court has awarded restitution for net income in a criminal case where the victim died, it did so because the controlling state statute explicitly adopted "the civil measure of damages for wrongful death." [187]

This court's restitution decision is governed by the MVRA. The statute mandates restitution for "income lost"—not "*net* income lost," as the parties restrictively read the statute. Moreover, construing the statute as covering all income is the only way to achieve the aim of Congress to give full restitution to victims. The lost income provision applies both to crimes of violence that leave victims dead and to crimes of violence that leave victims disabled.[188] If the court were to read the lost income provision as authorizing only net income, then disabled victims of violence would be left grossly undercompensated. For example, consider an unmarried victim who is maimed in a violent criminal attack and left unable to work. Under a "net income" theory, the court should not order restitution for the victim's lost income but instead should first subtract "consumption"—that is, such things as food, shelter, clothing, and other necessary expenses. As Dr. Randle's figures suggest in this case, a deduction for consumption might reduce the restitution award by as much as 80% or more of victim's income. More important, this deduction would mean that the victim would not receive restitution for the very expenses that were most necessary for her day-to-day living, hardly a result that meets the congressional mandate "to restore the victim to his or her prior state of well-being to the highest degree possible." [189]

At the hearing on this issue, the government attempted to argue its way out of this seemingly illogical result by reading the statute one way for disabled victims (they receive gross income) and another way for murdered victims (they receive only net income).[190] But the statute draws no such distinction. Instead, it broadly commands that the court shall enter an order of restitution which shall "reimburse

---

**185.** Report of Dr. Randle in *United States v. Bedonie*, Apr. 22, 2004, at 5 (tbl.6).

**186.** *See United States v. Nichols*, 169 F.3d 1255, 1278 (10th Cir.1999).

**187.** *See State v. Mayberry*, 415 N.W.2d 644, 645 (Iowa 1987) (quoting Iowa Code § 910.1(2)).

**188.** *See* Section I.B.3., *supra*.

**189.** *United States v. Hill*, 798 F.2d 402, 405 (10th Cir.1986) (citing S.Rep. No. 97–532, 97th Cong., 2d Sess. 30, *reprinted in* 1982 U.S.C.C.A.N. 2515, 2536).

**190.** Restitution Hr'g, Apr. 15, 2004, Tr. at 22–23.

the victim for income lost by such victim as a result of such offense."[191] It would seem quite odd to read "income lost" as meaning two very different things, depending on whether the victim lived or died as the result of the defense. The oddity only increases when one recognizes that the MVRA also applies to intermediate cases, such as ones in which the victim succumbs to injuries inflicted by a violent criminal after, say, six months. On the government's interpretation, the court would order restitution for the victim's *gross* "income lost" for the first six months, but then only *net* "income lost" after that. The meaning of the words "income lost" should not fluctuate so dramatically. "Income lost" should be read as meaning either gross income or net income. As a result, the court might be forced to choose between the net income interpretation—clearly requiring violent criminals to pay insufficient restitution to disabled victims—or the gross income interpretation—arguably requiring such criminals to pay excessive restitution to murder victims. If this were truly the choice, the court would err on the side of insuring full restitution for victims and opt for the higher restitution figure.

But the court is not persuaded that awarding gross income produces any kind of excessive restitution. The government's and defendants' arguments are predicated on the assumption that the "victims" of these homicides are the victims' estates, not the people who were killed. The court has previously explained why the decedents themselves—Mr. Johnson and Beyonce Serawop—are the victims.[192] Although the estates may ultimately receive the restitution award, the MVRA directs an award based on the victim's loss, not the estate's loss.

In homicide cases, good reasons support using the victims' full loss as the measure restitution. One of the core purposes of restitution is to "ensure that the offender realizes the damage caused by the offense and pays the debt owed to the victim as well as to society."[193] When a criminal murders someone, the damage caused by the offense to the victim and to society is the full amount that the victim was contributing to society—as reflected in the victim's total earnings—not some truncated amount that subtracts consumption.

Attempts to quantify the costs of crime have used the full value of murder victims' earnings. The most comprehensive study by the National Institute of Justice included "wages" lost by murder victims as part of a reasonable cost estimate.[194] Interestingly, the study found that lost productivity from fatal crimes was, on average, not less than $724,000,[195] which suggests that Dr. Randle's figures here are generally conservative.

Further confirming the conclusion that the MVRA does not envision a consumption offset are the procedural provisions found in the MVRA—18 U.S.C. § 3664. Section 3664 spells out in considerable detail how the court is to collect information relevant to the restitution award. The statute repeatedly directs the court to collect information about the victim's "losses."[196] No where does the statute direct the court to collect information about a

**191.** 18 U.S.C. § 3663A(b)(2)(C).

**192.** *See* Section II.A, *supra.*

**193.** *Reano,* 298 F.3d at 1212.

**194.** U.S. Dept. of Justice, Nat'l Inst. of Justice, Victim Costs and Consequences: A New Look 13 (1996).

**195.** *Id.* at 9.

**196.** *See, e.g.,* 18 U.S.C. § 3664(a) (presentence report shall contain "a complete accounting of the *losses* to each victim"); § 3664(d)(2)(A)(vi) (victim may submit affidavit regard "the amount of the victim's *losses* subject to restitution"); § 3664(d)(4) (estab-

victim's living expenses—necessary information for calculating consumption.

Moreover, the MVRA has provisions that appear to conflict with the idea of a consumption offset. For example, the MVRA directs a court *not* to consider "the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source...."[197] Instead, when a victim has received compensation from insurance or any other source, "the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation...."[198] This subrogation provision has been interpreted by several circuits as blocking an offset against the government as a victim even where the government has forfeited funds of the defendant.[199] Moreover, the provision revamps restitution procedures by allowing insurance offsets "to be handled separately as potential credits against the defendant's restitution obligation—not as reductions in the amount of that obligation in the first instance."[200]

The subrogation provision appears to be designed to reimburse insurance companies (among others) when they make payments for the costs of violent crimes, including payments on policies covering lost income. But effective surrogation will not be achieved if the court offsets lost income by consumption. Consider, for example, a victim of a crime of violence who has insurance for lost income of $100,000. If the court awards restitution for only net lost income to the victim—let us say $20,000 after discounting for consumption—the insurance company will not be reimbursed for the full amount that it has paid, a result seemingly at odds with the provision.

A final note is important here. The court is troubled by the parties' description of an award of gross income restitution as producing some kind of a "windfall." To the extent the claim is made about Mrs. Johnson and Ms. Moya, they have lost a son and a daughter from criminal violence inflicted by the defendants. Nothing that this court can order the defendants to pay will come anywhere close to covering their losses, much less create a "windfall." Moreover, unlike some civil settings where the estate is entitled to recovery, here the recovery is for the deceased victims. They will not given an excessive award. The parties ask the court to subtract consumption because the victims would have had living expenses—such as housing, clothing, and meals. But the defendants in this case deprived the victims of the opportunity to enjoy such consumption. Because of the defendants' criminal violence, the victims never got to buy a home, dress in new clothes, or partake in meals with family and friends. In short, the defendants deprived the Mr. Johnson and Beyonce Serawop of the chance to enjoy life. It hardly creates a "windfall" to require the defendants to pay restitution for the consumption that the victims never had the chance to savor.

---

lishing procedures if "the victims *losses* are not ascertainable" 10 days before sentencing); § 3664(e) ("burden of demonstrating the amount of the *loss* sustained by the victim" is on the government); § 3664(f) ("the court shall order restitution to each victim in the full amount of each victim's *losses*"); § 3664(h) (establishing procedures if "more than one defendant has contributed to the *loss* of a victim") (emphasis added in all of the above).

197. 18 U.S.C. § 3664(f)(1)(B).

198. 18 U.S.C. § 3664(j)(1).

199. *See, e.g., United States v. Bright,* 353 F.3d 1114, 1122 (9th Cir.2004); *United States v. Alalade,* 204 F.3d 536, 540 n. 4 (4th Cir. 2000), *cert. denied,* 530 U.S. 1269, 120 S.Ct. 2736, 147 L.Ed.2d 997 (2000).

200. *Bright,* 353 F.3d at 1121.

For all these reasons, the court concludes that an adjustment for consumption is not appropriate when determining lost income restitution under the MVRA. Instead, the court must enter a restitution award for the full lost income the victims were earning.

## IV. Restitution is also Proper for the Services of a Navajo Medicine Man.

■ The final issue on restitution arises in the Bedonie case: Whether expenses connected with the services of Navajo medicine man are awardable funeral expenses under the MVRA. At the sentencing hearing on January 22, 2002, the court find that such expenses were awardable. This portion of the opinion explains the rationale for the court's order.

At the sentencing hearing, Ms. Johnson credibly testified regarding her decision to use a medicine man to perform services for her deceased son. She explained that she and her children had been raised in the "traditional way," that is, in the Navajo tradition. In the aftermath of the death of her oldest son (Brian), her younger son came to her and asked her make him feel better. Ms. Johnson explained that "I don't know how to help you, I am still hurting." [201] Based on further discussions with her son, she decided that the traditional ways might help him. Because of her concern for her son, she decided to seek the services of a medicine man. Ms. Johnson explained that it is connected with the burial service,[202] and is something that is usually done in the Navajo tradition as part of the healing process.

The MVRA provides that the court shall ordered restitution of "an amount equal to the cost of *necessary funeral and related services.*" [203] Defendant Bedonie does not dispute that burial expenses must be awarded under this provision. She challenges, however, the expenses associated with the traditional ceremonies performed by the medicine man. In her view, the only expenses awardable under this section are those that "must be done to every body, in every instance, to prepare [the body] for burial and/or cremation.... [The] services provided by a Native American medicine man are nonessential expenses which are done by choice in compliance with that individual's religious and/or cultural beliefs." [204]

The court declines to take such a stilted view of the statute. Congress intended to force criminals to "pay *full* restitution" to the identifiable victims of their crimes.[205] On the defendant's reading, the only expenses awardable would apparently be the wages of the laborer who digs the grave or cremates the body. Commonplace expenses—such as a casket or urn, flowers, a mortuary, and indeed even a funeral—would seemingly be excluded, as it cannot be said that these services "must be done to every body in every instance."

Congress did not take such a stingy approach to compensating families who lost a loved one due to a crime violence. Instead, Congress authorized reimbursement for the cost of "funeral" services. A "funeral" is conventionally understood as

**201.** Sentencing Hearing, *United States v. Bedonie*, Jan. 21, 2004, Tr. at 11.

**202.** *Id.* at 12.

**203.** 18 U.S.C. § 3663A(b)(3).

**204.** Def.'s Mot. Requesting that Monies Spent on Native American Ceremonies Not be In-

cluded as Part of Restitution Owed at 3, *United States v. Bedonie* (Jan. 20, 2004) (Dkt. No. 19-1).

**205.** *Reano*, 298 F.3d 1208, 1211 (emphasis added) (*quoting* S.Rep. No. 104-179, at 12 (1996), reprinted in 1996 U.S.C.C.A.N. 924, 925).

including "the observances held in honor or on behalf of one who has died." [206] *Black's Law Dictionary* defines "funeral expenses" as encompassing "[m]oney expended in procuring the internment, cremation, or other disposition of a corpse, including suitable monument, perpetual care of burial lot, and entertainment of those participating in [a] wake." [207] Thus, a reasonable argument can be made that the services of a Native American medicine man are compensable as "funeral" expenses, as the services would seem to be part of the observances held in honor of the deceased victim, akin to a wake for which expenses are traditionally awarded.[208]

But Congress did not limit the awardable expenses merely to necessary *funeral* expenses. Instead, Congress generously allowed compensation for *"related* services." The term "related" is typically interpreted broadly.[209] The term seems to envision expenses for things that are not actually part of the funeral, but are connected to it. The services of a medicine man would appear to fit comfortably within this concept of "related services."

This analysis is supported by the only reported decision to have considered the issue of restitution for Native American funeral services. In *United States v. Iron Cloud,*[210] the Eighth Circuit upheld a restitution order under this section for a "giveaway ceremony" held by the a Native American father of a girl who was killed.[211] In a brief opinion, the court noted that this ceremony "has its roots in indigenous social and religious rituals" and that its purpose is "to honor persons in a traditional indigenous manner." [212] According to the victim's father, the "giveaway ceremony would be a memorial for his daughter to show how much she was loved." The Eight Circuit concluded that the expenses for the giveaway ceremony, which were not challenged by the defendant, were properly awardable under the MVRA.

The court concludes that the $3140 used to pay a medicine man for traditional ceremonies associated with Mr. Johnson's death was compensable under the Mandatory Victim's Restitution Act. Like the father in *Iron Cloud,* Ms. Johnson credibly testified that she followed the traditional ways and customs. Although defendant Bedonie countered that these expenses were not "necessary," she offered no basis for this conclusion other than the argument that "services provided by a Native American medicine man are nonessential expenses which are done by choice in compliance with [Ms. Johnson's] religious and/or cultural beliefs." [213] Because the

**206.** Webster's Third New International Dictionary 922 (unabridged 1993) (first definition).

**207.** Black's Law Dictionary 675 (6th ed.1990).

**208.** *See, e.g., In re Johnson Estate,* 8 Pa. Co. Ct. R. 1, 3.; *Oster's Executer v. Ohlman,* 187 Ky. 341, 219 S.W. 187 (1920).

**209.** *See, e.g., Coregis Ins. Co. v. American Health Foundation, Inc.,* 241 F.3d 123, 128 (2nd Cir.2001) (holding that "[t]he term 're-lated to' is typically defined more broadly [than the term arising out of] and is not necessarily tied to the concept of a causal connection"); *Gregory v. Home Ins. Co.,* 876 F.2d 602, 606 (7th Cir.1989) (stating that "the common understanding of the word 'related'

covers a very broad range of connections, both causal and logical"); *Vermont Pure Holdings, Ltd. v. Descartes Systems Group, Inc.,* 140 F.Supp.2d 331, 334 (D.Vt.2001) (stating that "the ordinary meaning of the term 'related to' [is] clear, unambiguous, and quite broad").

**210.** *United States v. Iron Cloud,* 312 F.3d 379, 382–83 (8th Cir.2002).

**211.** *Id.* at 382–83.

**212.** *Id.* at 383 n. 3.

**213.** Def.'s Mot. Requesting that Monies Spent on Native American Ceremonies not be In-

healing process is so subjective and personal, this argument is not by itself enough to refute the court's factual conclusion that, for Ms. Johnson, the expenses *were* necessary and related to her son's funeral. While the court recognizes that restitution under this provision may be limited by principles of reasonableness, this case does not test those limits of reasonableness. Accordingly, Ms. Johnson is also entitled to restitution for the $3,140 she paid for the medicine man's services.

## V. The Defendants' Restitution is Due Immediately, Payable on a Schedule.

 The final issue that remains is arranging the details for the payment of the restitution that has been ordered in both cases. It is clear that the defendants will not be able to pay the restitution awards in full immediately. As a result, two interrelated problems arise: First, are the restitution awards due immediately in full; and, second, should the court establish a payment schedule for the awards.[214] The government has asked for court to order immediate payment of the restitution.[215] The defendants have not responded to the immediate payment argument, but urge the court to impose a modest restitution schedule.

As a practical matter, the defendants will need to make installment payments on the restitution awards. While the defendants do not have other more important financial obligations, the restitution awards are quite large and neither defendant has any assets from which to pay restitution.[216] Any payments must therefore come from current income. The income for both defendants in the near future will not be substantial, as they will both be serving prison sentences.

For prisoners who have financial obligations, the Bureau of Prisons has in place a sophisticated program for developing an installment payment plan—the Bureau of Prison's Inmate Financial Responsibility Program (IFRP). Under the relevant *Code of Federal Regulations,* the staff of the facility in which the inmate is serving time will help the inmate develop a plan for paying all financial obligations, including not only restitution, but also other obligations such child support and alimony.[217] Ordinarily, the regular payments will not be less than $25 per quarter. The payments will be more if the inmate is eligible to work in UNICOR.[218] Such inmates will typically be required to allot not less than 50% of their monthly pay toward restitution and other payments.[219]

In light of the Bureau of Prisons' program and the uncertainty at this date about whether the defendants will be eligible for a paid work assignment, one possible approach to the restitution awards would be to simply declare them due and payable in full immediately. Until recent years, this was the traditional language federal courts used in awarding restitu-

cluded as Part of Restitution Owed, *United States v. Bedonie,* Jan. 20, 2004 (Dkt. No. 19–1).

**214.** *See generally* Royal Furgeson, Jr., Catharine M. Goodwin, and Stephanie Lynn Zucker, *The Perplexing Problem with Criminal Monetary Penalties in Federal Courts,* 19 Rev. Litig. 167 (2000) (helpfully reviewing these issues).

**215.** Government's Position on Calculation of Future Lost Income Restitution at 11, *United*

*States v. Serawop,* Apr. 14, 2004 (Dkt. No. 89–1).

**216.** *See* 18 U.S.C. § 3664(f)(2) (listing these factors as relevant to restitution schedules).

**217.** 28 C.F.R. § 545.11(a).

**218.** The term "UNICOR" is based upon nothing specific. It is merely the trade name for Federal Prison Industries, Inc.

**219.** 28 C.F.R. § 545.11(b).

tion.[220] This approach had the advantage of allowing the Bureau of Prisons to begin immediate collection of restitution through its program and later, after a defendant's release from prison, for the probation office to do the same thing. The Bureau of Prison and probation office could determine what schedule was appropriate in light of the defendant's changing jobs and other financial circumstances, without burdening the court with monitoring such events.

Whatever the practical advantages of this approach, it is now a plainly impermissible delegation of judicial authority in this Circuit. In *United States v. Overholt*, the Tenth Circuit held that establishing a restitution schedule cannot be delegated to the Bureau of Prisons or probation officers.[221] *Overholt* recognized the practice advantages of allowing prison and probation officials to adjust payments schedules in light of changing economic circumstances.[222] Nonetheless, the MVRA repeatedly specifies that the court must be involved in restitution schedules. For example, the defendant must notify "the court" of any material change in her economic circumstances, after which "the court" may make any adjustments in the restitution schedule that the interests of justice require.[223] *Overholt* therefore held that, "In light of this statutory scheme, we see no room for delegation by the district court with respect to payment schedules for restitution."[224] *Overholt* is in line with many, but not all, of the other circuits.[225]

*Overholt* involved a district court restitution order that provided that the restitution was to "be paid in full immediately" and that any restitution "not paid immediately" was to be paid through the Bureau of Prisons' IFRP and, after release from prison, as a condition of special release. It is thus arguable that *Overholt* requires the court to set a payment schedule and that the defendants are not obligated to pay anything over and above that schedule. Such a reading would significantly hamper crime victims. If a crime victim wishes to pursue collection of a restitution award, he might find that he was entitled to nothing more than nominal payments (which may have be paid already through the IFRP, for example).[226] This result would be contrary, of course, to the fundamental purposes of the MVRA. The Act was designed to "force offenders to 'pay full restitution to the identifiable victims of their crimes'"[227] and to "streamline" provisions

**220.** *See* Ferguson, *supra*, 19 Rev. Litig. at 171 (citing, inter alia, criminal judgment form from the Administrative Office of the Courts with this language).

**221.** 307 F.3d 1231 (10th Cir.2002).

**222.** *Id.* at 1256 (citing *Weinberger v. United States*, 268 F.3d 346, 362–64 (6th Cir.2001) (Cohn, J., concurring)).

**223.** 18 U.S.C. § 3664(k).

**224.** 307 F.3d at 1256.

**225.** *Compare United States v. Overholt*, 307 F.3d 1231, 1255–56 (10th Cir.2002) (delegation not permitted); *United States v. Porter*, 41 F.3d 68, 71 (2nd Cir.1994) (same); *United States v. Coates*, 178 F.3d 681, 685 (3rd Cir. 1999) (same); *United States v. Johnson*, 48 F.3d 806, 808 (4th Cir.1995) (same); *United States v. Albro*, 32 F.3d 173, 174 (5th Cir. 1994) (same); *United States v. Mohammad*, 53 F.3d 1426, 1438–39 (7th Cir.1995) (same); *United States v. McGlothlin*, 249 F.3d 783, 785 (8th Cir.2001) (same); with *Weinberger v. United States*, 268 F.3d 346, 360 (6th Cir. 2001) (permitting delegation); *United States v. Signori*, 844 F.2d 635, 641 (9th Cir.1988) (same); *United States v. Fuentes*, 107 F.3d 1515, 1528 n. 25 (11th Cir.1997) (same, but criticizing binding circuit precedent).

**226.** *See United States v. James*, 312 F.Supp.2d 802, 806, & n. 8, 2004 WL 764535 at *4 & n. 8 (E.D.Va.2004) (noting this problem).

**227.** *United States v. Reano*, 298 F.3d 1208, 1211 (10th Cir.2002) (quoting S.Rep. No. 104–179, at 12 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 925).

for collecting restitution.[228] Moreover, the MVRA contains an enforcement provision that seems to envision restitution orders that are due in full immediately. Following the entry of judgment, the MVRA allows a crime victim to obtain from the clerk of the court an abstract of judgment for the full amount of the restitution order.[229] This provision allows a crime victim to convert immediately the restitution order into a judgment for the full amount of the order, apparently without regard to any payment schedule that the court might set.[230]

The court believes that *Overholt* did not intend to harm victims by precluding a court from ordering that restitution is due in full immediately. Instead, the court understands *Overholt* to hold that the district court must set a restitution schedule by which the defendant can discharge her restitution obligations over time, even though the full obligation remains due to the victim immediately.

The Fourth Circuit has reached this conclusion in *United States v. Dawkins*.[231] The Fourth Circuit had previously held (like the Tenth in *Overholt* ) that the district court could not delegate establishment of a payment schedule to other entities.[232] Nonetheless, the Fourth Circuit approved a district court's immediately-due-plus-schedule judgment, finding that the district court had "effectively discharged its responsibility to set a payment schedule" with the combined approach.[233]

The Seventh Circuit has also reached a similar result. It has upheld restitution orders requiring immediate payment of restitution even where the defendant was of limited financial means. The Circuit has explained that "[i]mmediate payment does not mean immediate payment in full; rather it means payment to the extent that the defendant can make it in good faith, beginning immediately." [234]

In contrast to the Fourth and Seventh Circuits, several other circuits have raised questions about restitution orders payable immediately. For instance, the Second Circuit held that an order of immediate restitution was erroneous where the defendant had no assets.[235] In a later opinion, the Second Circuit explained that a defendant is obligated to pay the full amount of restitution when and if he acquires sufficient funds.[236] But until he has the funds to do so, a district court should establish a payment schedule for his term of incarceration as well as supervised revised.[237] Similarly, the Third Circuit has held that a restitution order without a payment schedule was erroneous, overruling the government's argument that immediate payment was a sufficient schedule under the facts of that case.[238] Finally, the Fifth Circuit re-

**228.** S.Rep. No. 104–179, at 20 (1996), *reprinted in* 1996 U.S.C.C.A.N. 924, 933.

**229.** 18 U.S.C. § 3664(m)(1)(B).

**230.** *See United States v. Walker*, 353 F.3d 130, 133 (2nd Cir.2003); *United States v. James*, 312 F.Supp.2d 806, 2004 WL 764535 at * 4 (E.D.Va.2004).

**231.** 202 F.3d 711 (4th Cir.2000).

**232.** *United States v. Johnson*, 48 F.3d 806, 808 (4th Cir.1995).

**233.** *Dawkins*, 202 F.3d at 716.

**234.** *United States v. McIntosh*, 198 F.3d 995, 1004 (7th Cir.2000); *see also United States v. Trigg*, 119 F.3d 493, 499–500 (7th Cir.1997).

**235.** *United States v. Mortimer*, 52 F.3d 429, 436 (2nd Cir.1995), *cert. denied*, 516 U.S. 877, 116 S.Ct. 208, 133 L.Ed.2d 141 (1995).

**236.** *United States v. Kinlock*, 174 F.3d 297, 301 (2nd Cir.1999).

**237.** *Id.*

**238.** *United States v. Coates*, 178 F.3d 681 (3rd Cir.1999).

versed a district court restitution order that required a defendant immediately pay $40,000 without findings that the defendant could make such a payment.[239]

It is possible to read these opinions from the Second, Third, and Fifth Circuit as conflicting with those from the Fourth and the Seventh,[240] and perhaps in certain respects they do. For present purposes, however, it seems that a reconciling reading may be available by separating two concepts. Restitution orders can be (1) "payable" immediately or (2) "due" immediately. The holdings of the Second, Third and Fifth Circuit's focus on whether restitution orders can properly be made *payable* immediately where the defendant lacks sufficient funds to pay. On the other hand, the Fourth Circuit and Seventh Circuit focus on making restitution *due* immediately, which permits collection efforts to proceed even though the sentencing courts does not expect the defendant to pay in full.

In retrospect, the conflation of these two concepts is understandable. The standard criminal judgment form from the Administrative Office appeared to use these two terms interchangeably.[241] But the concepts are distinguishable and should be distinguished. Nothing in the MVRA provides any reason for blocking district courts from making restitution due immediately, even if the defendant is only expected by the court to make payments on a more modest schedule. Making the payment due immediately allows crime victims (and others benefitted by a restitution award) to pursue their own enforcement efforts, for example by using the MVRA

provision allowing the restitution award to reduced to a civil judgment. At the same time, the court will not be ordering an impossible payment and necessarily forcing the defendant into non-compliance with a court-ordered requirement.

This approach has been adopted in some states, with Utah serving as a convenient example. Utah statutes distinguish between "complete restitution" and "court-ordered restitution."[242] The sentencing court will generally award complete restitution, which becomes a judgment against the defendant. At the same time, the court also identifies court-ordered restitution, which is the restitution that sentencing court will enforce through its monitoring and sanctions.

■ In light of all these considerations, defendant Bedonie and Serawop's restitution awards should be due in full immediately, but payable on a court-established schedule. The schedule should reflect the Bureau of Prison's IFRP guidelines, as this in an appropriate factor for the court to consider.[243]

Having also considered defendant Bedonie's relevant financial circumstances,[244] the court orders that her restitution is due in full immediately, but payable on a schedule of $25 per quarter or 50% of her income (whichever is greater) while in prison and for sixty days after her release. Thereafter, restitution shall be paid at a rate of $100 per month or 20% of her take-home pay (whichever is greater). At the time of the defendant's release, the probation officer shall take into consideration

**239.** *United States v. Myers,* 198 F.3d 160, 169 (5th Cir.1999).

**240.** *See, e.g.,* Furgeson, *supra,* 19 Rev. Litig. at 173–76.

**241.** *See id.* at 171 n. 2.

**242.** *See* UTAH CODE ANN. § 76–3–201(c)(i) & (ii).

**243.** *See U.S. v. Kinlock,* 174 F.3d 297, 300 (2nd Cir.1999) (citing *Mortimer II,* 94 F.3d 89, 91 n. 2 (2nd Cir.1996)).

**244.** 18 U.S.C. § 3664(f)(2).

defendant Bedonie's economic status as it pertains to her ability to pay the restitution ordered and shall notify the court of any changes that may need to be made to the payment schedule. The defendant shall advise the court and the Attorney General, through the probation office, of any material change in her financial circumstances.[245]

With respect to defendant Serawop, his financial circumstances are slightly different. He currently receives a stipend from his tribe of $100 per month. These funds should go toward restitution and may serve to illustrate that even apparently indigent defendants may be able to make significant restitution payments. Over the course of Serawop's ten-year prison term, the cash value of the stipend alone will be more than $10,000. Having considered defendant Serawop's relevant financial circumstances,[246] the court orders that his restitution is due in full immediately, but payable on a schedule of the full sum of his stipend (currently $100 per month) plus $25 per quarter or 50% of his income (whichever is greater) while in prison and for sixty days after his release. Thereafter, restitution shall be paid at a rate of the full sum his stipend plus 20% of his take-home pay (whichever is greater). At the time of the defendant's release, the probation officer shall take into consideration the defendant's economic status as it pertains to his ability to pay the restitution ordered and shall notify the court of any changes that may need to be made to the payment schedule. The defendant shall advise the court and the Attorney General, through the probation office, of any material change in his financial circumstances.

The court has discretion in determining whether interest should accrue on unpaid restitution.[247] In view of the size of the restitution awards, the court waives the requirement for payment of interest.

## CONCLUSION

The defendants in these cases killed two innocent persons, depriving them of (among many other things) the opportunity to pursue their careers and to become economically successful. Under the MVRA, it is appropriate that the defendants pay sizable restitution awards for the income that the victims lost. Accordingly, the court orders defendant Bedonie to pay restitution for lost income of Mr. Johnson of $446,665 with additional conditions as explained in this opinion. Defendant Bedonie shall also pay restitution for the services of a Navajo medicine man used by the victim's family. The court orders defendant Serawop to pay restitution for lost income of Beyonce Serawop of $325,751 with additional conditions as explained in this opinion. An appropriate amended judgment reflecting these restitution awards will be filed today.

SO ORDERED.

---

**245.** *See* 18 U.S.C. § 3664(k).

**246.** 18 U.S.C. § 3664(f)(2).

**247.** 18 U.S.C. § 3612(f)(3).